Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 05-23045-CIV-MOORE

| | |
|---|---|
| MICCOSUKEE TRIBE OF INDIANS<br>OF FLORIDA, a federally-recognized<br>Indian Tribe;<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA; U.S. FISH &<br>WILDLIFE SERVICE; DIRK KEMPTHORNE,<br>Secretary of the Interior, in her official capacity;<br>H. DALE HALL, Director of the U.S.<br>Fish & Wildlife Service, in his official capacity;<br>SAM D. HAMILTON, Regional Director of the U.S.<br>Fish & Wildlife Service, in his official capacity; and<br>PAUL SOUZA, Field Supervisor, U.S. Fish &<br>Wildlife Service, in his official capacity,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>/ |

## SECOND AMENDED COMPLAINT OF THE MICCOSUKEE TRIBE OF INDIANS
(January 23, 2007)

Plaintiff, Miccosukee Tribe of Indians of Florida, files this Second Amended Complaint [1]

seeking injunctive and declaratory relief for a faulty biological opinion in violation of the

Endangered Species Act ("ESA") and its implementing regulations, pursuant to the Administrative

Procedures Act ("APA") (Count I); for violations of Section 7 of the ESA and its implementing

regulations (Count II); for violations of Section 9 of the ESA and its implementing regulations

(Count III); and for improper agency action under the Administrative Procedure Act (Count IV) in

connection with the issuance of the U.S. Fish and Wildlife Service Biological Opinion ("BO") on

---

[1] The Court issued an order on May 12, 2006 (DE 38), dismissing counts III, IV and VI of
the Tribe's Amended Complaint.

the U.S. Army Corps of Engineers Interim Operational Plan (IOP) for the Cape Sable Seaside Sparrow, dated November 17, 2006[2] (which FWS claims supersedes the March 28, 2002 ("Amended BO"), and the initial February 1999 Biological Opinion) without the proper analysis required by law and in disregard of the Plaintiff's rights.  Plaintiff further alleges as follows:

## PLAINTIFF

1.      The Miccosukee Tribe of Indians of Florida ("Tribe") is a federally-recognized and federally-protected Indian Tribe, exercising powers of self-government under a Tribal constitution approved by the Secretary of the Interior, pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 476.  The Tribe's members reside, use, enjoy, and work within the Florida Everglades on Indian lands in the Miccosukee Reserved Area ("MRA") on the border of Everglades National Park ("ENP"), on perpetually-leased Indian lands in Water Conservation Area 3A ("WCA 3A"), and on Federal Reservation lands.  The Tribe's members depend upon the Everglades for their culture and way of life.  The perpetual lease agreement for WCA 3A promises that this area of the Everglades will be preserved in its natural state for the use and enjoyment of the Miccosukee Tribe, and that wildlife and their habitat there will be preserved.  The perpetual lease also acknowledges the right of Miccosukee Tribal members to reside in the Leased Area in the Everglades in WCA 3A; to hunt, fish, frog, and engage in traditional subsistence agriculture; to take and use native materials for Tribal purposes; and to use the area for Tribal religious purposes as they have done for generations.

2.      The Everglades has been the home of the Miccosukee people for generations and is an integral part of their culture, subsistence, religion, historical identity, and way of life.  The Tribe

---

[2]The FWS November 17, 2006, Biological Opinion states that it "supercedes" the March 28, 2002 Amended Biological Opinion ("Amended BO") and the original February 1999 Biological Opinion. However, since the FWS also claims it relied on information in both of these predecessor biological opinions, the Tribe refers to them herein.

has traditional, aboriginal, and statutory rights to use and occupy the Everglades and the Big Cypress National Preserve. The Miccosukee people also have a spiritual, cultural, and historical connection to the entire Everglades ecosystem, including the wildlife, and use and enjoy the entire Everglades.

3.      The Tribe's land interests include: (i) Federal Indian Reservations located within the Everglades; (ii) perpetual Indian Reservation rights to a portion along the border of Everglades National Park (designated by an Act of Congress as the Miccosukee Reserved Area); (iii) a perpetual lease for the use and occupancy of substantial portions of Water Conservation Area 3A ("WCA 3A") that both the United States and the State of Florida promised to preserve in a natural state in perpetuity; (iv) aboriginal title of Tribal members to portions of the Everglades; and (v) rights to traditional use and occupancy in Everglades National Park and Big Cypress National Preserve; all pursuant to federal law.

## DEFENDANTS

4.      The United States of America ("the federal government") is the government of the United States, which may be named as a defendant and against which mandamus, a declaratory judgment and injunctive relief may be entered, pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and FED. R. CIV. P. 57 and 65(a).

5.      The U.S. Department of the Interior ("DOI") is an agency of the federal government which may be named as a defendant and against which mandamus, declaratory judgment and injunctive relief may be entered, pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and FED. R. CIV. P. 57 and 65(a).

6.      Dirk Kempthorne is the Secretary of the Interior ("Secretary"), and an employee of the United States and its agency, the Department of the Interior.  In this capacity, Secretary Kempthorne may be named as a defendant and against whom mandamus, declaratory judgment, and

3

injunctive relief may be entered, pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and FED. R. CIV. P. 57 and 65(a). On behalf of the federal government and its agencies, Secretary Kempthorne has been directly involved in violations of federal law.

7.      H. Dale Hall is the Director of the U.S. Fish and Wildlife Service, and an employee of the United States and its agency, the U.S. Department of the Interior. In this capacity, Director Hall may be named as a defendant and against whom mandamus, declaratory judgment, and injunctive relief may be entered, pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and FED. R. CIV. P. 57, and 65(a). On behalf of the federal government and its agencies, H. Dale Hall has been directly involved in violations of federal law.

8.      Sam D. Hamilton is the Regional Director of the U.S. Fish and Wildlife Service, and employee of the United States and its agency, the U.S. Department of the Interior. In this capacity, Mr. Hamilton may be named as a defendant and against whom mandamus, declaratory judgment, and injunctive relief may be entered, pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and F ED. R. CIV. P. 57, and 65(a). On behalf of the federal government and its agencies, Mr. Hamilton has been directly involved in violations of federal law.

9.      Paul Souza is the Field Supervisor, U.S. Fish and Wildlife Service, and an employee of the United States and its agency, the U.S. Department of the Interior. In this capacity, Mr. Souza may be named as a defendant and against whom mandamus, declaratory judgment, and injunctive relief may be entered, pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and FED. R. CIV. P. 57 and 65(a). On behalf of the federal government and its agencies, Mr. Souza has been directly involved in violations of federal law.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction of this civil action under 28 U.S.C. § 1331 (civil actions

arising under the Constitution, laws, or treaties of the United States); 28 U.S.C. § 1361 (action in the nature of a mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff); 28 U.S.C. § 1362 (civil actions brought by federally-recognized Indian Tribes wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States); 5 U.S.C. §§ 701 *et seq.* (Administrative Procedure Act) and 16 U.S.C. § 1531 *et seq.* (Endangered Species Act).

11.     The Court may issue declaratory judgment and injunctive relief pursuant to these jurisdictional statutes and to 28 U.S.C. §§ 2201 and 2202, as well as to FED. R. CIV. P. 57 and 65(a).

12.     Venue in the Southern District of Florida is proper under 28 U.S.C. § 1391(e) because this is a civil action against the United States, or an agency thereof, and officers and employees of the United States, acting in their official capacity; Plaintiff resides within the Southern District; and a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of Florida.

13.     Pursuant to 16 U.S.C. § 1540 of the Endangered Species Act ("ESA"), a Notice of Intent to Sue on its continuing action in violation of the Endangered Species Act was given to the Secretary and the alleged violators on March 16, 1998 and supplemented on August 13, 2002, more than 60 days prior to the bringing of this lawsuit.

14.     No action by the Secretary has been commenced to prosecute, to impose a penalty, or to otherwise address the alleged violations.

## GENERAL ALLEGATIONS

15.     The Everglades ecosystem includes Lake Okeechobee, the Water Conservation Areas (WCA 1 or Loxahatchee National Wildlife Refuge, WCA 2, and WCA 3), Everglades National Park, and the Miccosukee Tribal leased lands and Federal Reservation lands.

16.     Water Conservation Area 3A ("WCA 3A") is a vast area of the central Everglades that comprises in excess of 100,000 acres in Miami-Dade and Broward Counties.

17.     WCA 3A is the largest remaining expanse of sawgrass Everglades left in existence and has numerous tree islands, which contribute significantly to the biodiversity of the Everglades.

18.     In 1977, portions of WCA 3A were designated under the Endangered Species Act as critical habitat for the Snail Kite, along with the Loxahatchee National Wildlife Refuge, WCA 2, portions of Everglades National Park, western portions of Lake Okeechobee, the Strazzulla and Cloud Lake reservoirs in St. Lucie County, and portions of the St. Johns Marsh in Indian River County. 50 C.F.R. § 17.95.

19.     The Everglades Snail Kite ( *Rostrhamus sociabilis plumbeus*) was first listed as endangered pursuant to the Endangered Species Preservation Act on March 11, 1967.

20.     The South Florida Multi-Species Recovery Plan, dated May 18, 1999 ("Recovery Plan"), includes the Recovery Plan for the endangered Snail Kite which states: "[i]n the United States, the snail kite is found only in the central and South Florida ecosystem, making it a suitable biological symbol for the ecosystem as a whole."

21.     The Recovery Plan states that the principal threat to the Snail Kite is the loss or degradation of wetlands in central and South Florida; that the regulation of water stages in lakes and in the WCAs is particularly important to maintain the balance of vegetative communities required to sustain Snail Kites; and that water management actions in the Everglades and in the lakes are the most important human controlled factors in survival and recovery of the Snail Kite.

22.     Flooding and sustained high water levels above natural levels in WCA 3A degrades the natural conditions of the Everglades, including the flora, fauna, and tree islands and results in the degradation and destruction of this  designated critical habitat for the endangered Snail Kite.

23.     Tamiami Trail is the southern boundary of WCA 3A, running in an east-west direction. Along Tamiami Trail are various water control structures and/or gates that stop the flow of water out of the central Everglades when they are closed and allow water to flow south when kept open. These water control structures include the S-12A, B, C and D structure gates and the S-333 and S-334 structures.

24.     In late 1997, the Fish and Wildlife Service ("FWS") began demanding the closing of the S-12 gates and certain other structures along Tamiami Trail, to stop the flow of water out of WCA 3A, allegedly to benefit the endangered Cape Sable Seaside Sparrow. FWS continued to demand these gate closings under the RPA adopted in the FWS 2002 Amended Biological Opinion, which mandated the closings of the S-12 A, B, and C gates, and the S-333 and S-334 structures continue in a staggered fashion, beginning on November 1st and continuing through July 15th. These FWS-demanded gate closings continue to this day under the RPA in the 2006 FWS Biological Opinion and have caused, and continue to cause, sustained high water levels in WCA 3A that have resulted in cumulative irreparable harm to the Tribe's culture and way of life, to Tribal lands and natural resources in WCA 3A, and to the Snail Kite and its designated critical habitat.

25.     The Cape Sable Seaside Sparrow ("Sparrow") was listed as an endangered species on March 11, 1967.

**The 1999 Biological Opinion**

26.     By letter dated October 17, 1997, the Fish and Wildlife Service required the Army Corps of Engineers ("Corps") to reinitiate consultation on the Modified Water Deliveries Project, Experimental Program, and the C-111 Project. As a result of the FWS demanded reinitiation of consultation with the Corps, the FWS issued a Biological Opinion dated February 19, 1999, that analyzed the proposed Modified Water Deliveries and C-111 Projects, as well as the Experimental

Water Deliveries Program ("Test 7") that was operating at that time.

27.    In the 1999 Biological Opinion, the FWS declared jeopardy on the Sparrow based on the unsupported hypothesis that the decline in Sparrow subpopulation A, located in the western portion of Everglades National Park, would result in Sparrow subpopulations B, C, D, E and F, located on the eastern side of Everglades National Park, going extinct.

28.    The FWS 1999 Biological Opinion concluded, without adequate evidence or analysis and with disregard for valid scientific opinion otherwise, that the decline of the western Sparrow subpopulation A was due to water flowing through the S-12 gates and other structures that allow water to move from the Everglades located north of Tamiami Trail into this area.

29.    The critical habitat  designated for the Sparrow in 1977 did not include the western subpopulation A area, on which the FWS based its 1999 "jeopardy" Biological Opinion.

30.    The 1999 Biological Opinion stated that, "[e]xcessive water storage in WCA 3A, above the current operating schedule, adversely impacts the endangered Wood Stork, the endangered Snail Kite, and designated Snail Kite critical habitat."

31.    The 1999 Biological Opinion reviewed the Recovery Plan Objectives that existed at that time for the Snail Kite, the Wood Stork, and the Sparrow.

32.    The 1999 Biological Opinion contained a Reasonable and Prudent Alternative ("1999 RPA"), which FWS claimed would prevent jeopardy to the Sparrow and that mandated, among other things, the closing of the S-12 gates and other structures.  Although the 1999 FWS RPA was never implemented as a whole, the closing of the gates and structures mandated by the FWS was implemented under unnamed deviations, the Interim Structural and Operation Plan ("ISOP"), and later the Interim Operational Plan ("IOP"), which was adopted as a FWS RPA.

33.    The 1999 Biological Opinion predicted that under the RPA there would be no incidental

8

take of Sparrows after 1999 and no incidental take of the Snail Kite.

**The 2002 Amended Biological Opinion and Amended Incidental Take Statement**

34.     The FWS-demanded gate closings continued, with modification, as part of a second Reasonable and Prudent Alternative (RPA), the Interim Operational Plan ("IOP"), which was adopted by the FWS in a  March 28, 2002 Biological Opinion that contained an Incidental Take Statement ("ITS") for the Snail Kite.  The 2002 Amended Biological opinion predicted that this new RPA would adversely impact the endangered Snail Kite and degrade 88,300 acres (10.5%) of its designated critical habitat in WCA 3A.

35.     The 2002 Amended Biological Opinion concluded, based on an inadequate analysis and stale data, that the anticipated degradation of 88,300 acres (10.5%) of Snail Kite critical habitat in WCA 3A from the implementation of the IOP RPA was not likely to jeopardize the continued existence of the Snail Kite or adversely modify its designated critical habitat.  The FWS' faulty analysis was not based on current population estimates for the Snail Kite and incorrectly assumed that Snail Kite numbers were increasing.

36.     The Amended Incidental Take Statement contained in the 2002 Amended Biological Opinion contained a high water criterion to address incidental take of the Snail Kite that read as follows: "Thus, if actual operations of IOP-Alt. 7R produces higher water levels than those predicted to occur via the SFWMM in Indicator Regions 14 (Southern WCA 3A) and 19 (Eastern WCA 3A), as measured by a gauge or gauges mutually agreed upon by the Service and the Corps as compared to a five-year rolling average of the model output for those indicator regions, then the Corps will have exceeded the incidental take authorized by this amendment."  The gauges to be used were not disclosed in the 2002 Amended Incidental Take Statement and no data has been reported in the 2006 Biological Opinion's  Incidental Take Statement to demonstrate whether this criterion has been met

and/or whether the incidental take of the Snail Kite has been exceeded.

37.     The FWS 2002 Amended Biological Opinion, which among other things adopted the IOP RPA, resulted in sustained high water in vast areas of Tribal Everglades in WCA 3A that has caused, and will continue to cause, cumulative irreparable harm to the Tribe's lands and tree islands in WCA 3A, the Tribal culture and way of life, the endangered Snail Kite and its critical habitat in WCA 3A, and adversely impacts the this area of the Everglades, and its wildlife and their natural habitat, that was promised to the Miccosukee Tribe to be preserved in a natural state in perpetuity for the benefit and use of the Tribe.

38.     The Miccosukee Tribe has filed a series of lawsuits beginning in 2000, and continuing through today, claiming that the FWS-demanded closing of the gates and structures would flood and destroy the Snail Kite critical habitat in WCA 3A and adversely impact the Snail Kite population.

39.     The 2002 Amended Biological Opinion removed the requirement in the 1999 RPA that the Modified Water Deliveries Project, a restoration project that was authorized by Congress in 1989 to restore more natural flows to the Everglades, must be completed by December 31, 2003, even though it would have benefitted the recovery of a number of endangered species, including the Snail Kite, the Wood Stork, and the Sparrow.

40.     The FWS failed to use the actual modeling of the RPA it adopted, IOP Alternative 7R, to analyze the impacts on the endangered Snail Kite and its critical habitat in the 2002 Amended Biological Opinion and the Amended Incidental Take Statement. The actual modeling for the RPA, which FWS did not use to assess impacts in the 2002 Amended Biological Opinion, shows an increase in the number of weeks of sustained high water levels in WCA 3A.

41.     The FWS not only failed to use the actual modeling of the RPA to conduct its analysis in the 2002 Amended Biological Opinion and Incidental Take Statement, it also failed to

require the Corps to reinitiate consultation on the endangered Snail Kite and its designated critical habitat in WCA 3A based on the adverse impacts that the FWS knew the modeling showed until forced by circumstances to do so on or about June 2006.

42.     On March 13, 2006, in a case the Tribe had filed against the Army Corps of Engineers, the Court found that the Corps violated NEPA by failing to use the Alternative 7R modeling to analyze the impacts of IOP and ordered the Corps to conduct a Supplemental Environmental Impact Statement ("SEIS") on IOP using the Alternative 7R modeling.

**The 2006 Biological Opinion and Incidental Take Statement**

43.     On or about June of 2006, the Corps and FWS were forced to reinitiate consultation under Section 7 of the ESA on the Court-ordered SEIS on IOP, which was allegedly formally requested by the Corps on July 7, 2006, even though documentation from the FWS shows the Service requested information from the Corps as early as June 7, 2006.

44.     On November 17, 2006, the FWS issued its 2006 Biological Opinion on the IOP, which the FWS states in the document supersedes the Service's previous 2002 Amended Biological Opinion and its 1999 Biological Opinion.

45.     The 2006 Biological Opinion also adopts the IOP as a Reasonable and Prudent Alternative ("RPA"). The new Incidental Take Statement in the 2006 Biological Opinion differs from the previous Amended Incidental Take Statement in the 2002 Amended Biological Opinion in that it deletes the high water criterion reporting trigger that would measure an exceedance of incidental take for the endangered Snail Kite due to high water conditions and allows takings of the Wood Stork and even the Sparrow. The vague and insufficient statement in the 2006 Biological Opinion that: "Instead of using the 5-year rolling average of water levels in two indicator regions to determine incidental take as in the Service's 2002 Biological Opinion, we will allow for real time

11

monitoring versus assessing incidental take over a long term," does not contain any reference as to whether and/or when and/or under what conditions, if any, incidental take for the Snail Kite under high water conditions can, or will be, exceeded.

46.     The 2006 Biological Opinion claims that the assessment of the effects of IOP on the Snail Kite in the document are based on the Service's 2002 Amended Biological Opinion, modeling provided in the Corps' SEIS, and observed data recorded during the operation of the ISOP, ISOP 2001, and IOP.

47.     The 2002 Amended Biological Opinion and Incidental Take Statement was based on the incorrect assumption that the RPA would be a short term water management action that would only be in place for approximately five years (until 2007).   The 2006 Biological Opinion acknowledges that IOP will not be a short term five year action but will continue for at least nine years until 2011.

48.     The IOP RPA is now estimated to be in place until 2011 (nine years), or even beyond, thus subjecting the endangered Snail Kite and its critical habitat to sustained high water conditions for four years longer than was analyzed in the 2002 Amended Biological Opinion and the cumulative impact of which was not adequately analyzed in the 2006 Biological Opinion and/or the Incidental Take Statement.

49.     Both the 2002 and 2006 Biological Opinions recognized that the IOP  RPA would not provide the same hydrological relief to the Snail Kite critical habitat in WCA 3A as the RPA in the 1999 Biological Opinion in that it would cause water levels in portions of the designated critical habitat to be higher than FWS had previously estimated.

50.     The finding in the 2002 Amended Biological Opinion that a continuous flooding of wetlands for more than four or five years is particularly associated with the degradation of Snail Kite

foraging habitat was eliminated from mention and/or analysis in the 2006 Biological Opinion, even though the FWS now admits that the IOP RPA will be implemented twice as long as the four or five years associated with the degradation of Snail Kite critical habitat. The 2006 Biological Opinion does not contain, discuss, nor analyze the scientific observation from the 2002 Amended Biological Opinion that Snail Kites in WCA 3A have increasingly moved their nesting activity to higher elevations as lower elevation habitat areas have been degraded by high water levels sustained by water management practices.

51.     The 2002 Amended Biological Opinion, which was not based on Alternative 7R modeling that showed more weeks of sustained high water, estimated that the disturbance intensity of Snail Kite critical habitat that could be adversely impacted by the RPA would be approximately 88,300 acres out of a total of 841,600 acres (or approximately 10.5%) of the available designated critical habitat. The 2006 Biological Opinion now estimates that as much as 184,320 acres a year of Snail Kite critical habitat could be degraded by the RPA but fails to assign a percentage (i.e. 21.9%), as it did previously. The 2006 Amended Biological Opinion does not even address the previous 88,300 acres of predicted degradation predicted nor contain any analysis of the total extent of Snail Kite critical habitat in WCA 3A that has already been individually and cumulatively degraded by previous deviations, ISOP, and prior IOP operations.

52.     The 2006 Biological Opinion claims that 184,320 acres of Snail Kite critical habitat in WCA 3A will occur in each of the next four years when water levels exceed 10.5 feet as measured at gauge 3A-28, Yet, the 2006 Biological Opinion improperly predicts only future IOP degradation without computing the exact amount of past degradation caused by previous deviations, ISOP, and IOP. Nowhere in the 2006 Biological Opinion is there a detailed scientific analysis of how the predicted degradation of 184,320 acres a year, which is more than half of the 319,078 acres of

designated Snail Kite critical habitat in WCA 3A, will not adversely modify the Snail Kite critical habitat, jeopardize its continued survival, or impact its recovery.

53.     The 2006 Biological Opinion states that the threats to the Snail Kite survival include "loss of wetland habitats, degradation of wetlands habitat, changes in hydrologic conditions, and impacts to prey base."

54.     The 2006 Biological Opinion states that "[re]gulatuion of water stages in the WCAs is particularly important to maintain the balance of vegetative communities required to sustain snail kites."

55.     The 2006 Biological Opinion admits that, "[d]uring the period that ISOP and IOP were operating, the snail population statewide declined by 50%."

56.     The 2006 Biological Opinion admits that, "the decline in the kite population since 1999 combined with the reduction in habitat conditions within one of the largest centers of kite breeding activity result in an increased risk to the kite population."

57.     The 2006 Biological Opinion states that, "[c]ontinued IOP operations are expected to result in continued habitat degradation within WCA 3A, which has been one of the most significant areas of kite habitat within the past 30 years."

58.     The 2006 Biological Opinion states, "IOP operations are expected to result in reduced nest success of kites within WCA 3A, reduced foraging habitat suitability, and reduced abundance to the kite's primary prey," and that "these impacts are expected to limit population growth in WCA 3A and possibly cause further reductions in overall kite populations."

59.     The 2006 Biological Opinion observes that the principal threat to the Snail Kite is the loss or degradation of wetlands in central and southern Florida; approximately 40% of the Snail Kite's designated critical habitat has been degraded since 1977; that continued IOP operations will

result in further Snail Kite critical habitat degradation over the next four years (i.e may be as much as 184, 320 acres a year for the next 4 years in WCA 3A) but then concludes contrary to the facts, and without proper evidence or analysis and with no estimate of the exact acreage of degradation to this area that has been caused individually and collectively by prior IOP and ISOP operations and previous deviations, that no permanent loss of Snail Kite critical habitat is expected and that adverse modification is not likely.

60.     The 2006 Biological Opinion observes that: during the period that ISOP and IOP were in operation, the Snail Kite population declined about 50%;  the decline in the Snail Kite population combined with reductions in habitat conditions within one of the largest centers of kite breeding activity (WCA 3A) result in an increased risk to the kite population; the apple snail (the kite's principal prey) densities dropped by 82% from 2003 to 2004 within southern WCA 3A due to high water levels; IOP may result in an increase in failure of up to 40% of nests within southern WCA 3A; and then concludes contrary to the facts and science, and without proper evidence analysis, that this does not pose a significant risk to the persistence of the species over the next four years.

61.     The 2006 Biological Opinion admits that stages in WCA 3A have exceeded 10.5 feet in 10 of the past four years ( in contrast to exceeding 10.5 feet only four times in the 40 year period from 1953 to 1993); that data from southern WCA 3A show that the wet prairie vegetation communities are changing to open slough communities; and that this trend is likely to continue under the IOP RPA for the next four years and will adversely impact foraging habitat, apple snail abundance and woody vegetation that kites use for nesting and perch-hunting; but then concludes contrary to the facts, and without proper evidence or analysis, that the changes are not expected to have long term significant impacts on Snail Kites and that the habitat changes are temporary and

15

reversible by favorable hydrological conditions.

62.     The 2006 Biological Opinion claims, based on stale data and without any analysis of the condition of the habitat in other parts of the Snail Kite's range, that the Kite can either move to other areas or wait out the unfavorable conditions; and ignores scientific warnings that the Snail Kite is up against the hydrological wall, and new information in the  Snail Kite Demography Annual Report 2004 and 2005 that most Snail Kites do not move as freely as previously thought among wetlands which are isolated by extensive areas of unsuitable habitats.

63.     While stating that the Snail Kite has been observed in areas outside of WCA 3A, the Biological Opinion fails to analyze the impact that other actions, including the mentioned draw-downs of Lake Kissimmee and Lake Tohopekiligia, programs for Lake Okeechobee and the estuaries, the CERP and ACCLER8 projects, and local and private projects  have had, or will have, on these areas to which FWS claims the Snail Kite can move.

64.     The 2006 Biological Opinion concludes, without adequate analysis or scientific proof and inconsistent with facts in the document and the Recovery Plan, that although the RPA could adversely impact 184,320 of Snail Kite Critical Habitat (21.9% of its total designated habitat) in WCA 3A per year for four years, this was not likely to jeopardize the continued existence of the Everglades Snail Kite and/or adversely modify its designated critical habitat.

65.     Evidence in the 2006 Biological Opinion contradicts the conclusion reached that the harm caused by IOP will not affect the survival of the Snail Kite.  For example, while the 2006 Biological Opinion attempts to attribute what scientists call the "alarming" and "drastic" decline in the Snail Kite population (which began in 1999 and persists through 2006)  to regional drought conditions during 2000-2001, it acknowledges that once the drought conditions ended the population estimates remained low.  The 2006 Biological Opinion contains no analysis of how the drought

conditions coupled with the 0.5 reduction in the bottom (Zone E) of the WCA 3A regulation schedule under ISOP and IOP, and the high water levels caused by the regulation schedule, have individually, and collectively, impacted the endangered Snail Kite and its critical habitat in WCA 3A in the past and will impact it in the future under IOP operations. Nor is there any analysis of the total impact that the low stages and high stages of IOP, when coupled with natural rainy or drought conditions, will have on the Snail Kite and its critical habitat in WCA 3A.

66.      The 2006 Biological Opinion contains current population estimates from scientists monitoring the IOP RPA, and reporting to the FWS, that demonstrate that there has been a   50% decline in the Snail Kite population during the years of ISOP and IOP operations, but does not divulge that scientists called this decline "drastic" and "alarming." Despite the "drastic" decline in Snail Kite population that has occurred, the 2006 Biological Opinion fails to provide any analysis of how the Snail Kite population estimates would be impacted in each part of its range, including its critical habitat range, by the IOP RPA.

67.      The 2006 Biological Opinion, like the 2002 Amended Biological Opinion before it, predicts the RPA will result in the taking of the Snail Kites but does not quantify the amount. This take would be in the form of harm resulting from significant habitat modification or degradation that results in death or injury to individual snail kites by impairing essential breeding and foraging patterns, as measured by the duration and frequency of high water events. The Incidental Take Statement in the 2006 Biological Opinion will result in the unrestricted taking of Snail Kites under the high water conditions that the FWS knows pose a threat to its survival. Even though the high water criterion five year test set forth in the 2002 Amended Incidental Take Statement was inadequate in that it failed to set forth a clear method for measuring performance and timely compliance, even this faulty trigger to determine an exceedance of incidental take of the Snail Kite

17

under high water conditions was removed from the 2006 Incidental Take Statement without any analysis of whether the IOP RPA, using the proper modeling, had caused this take to be exceeded. The FWS removed the high water criterion incidental take exceedance requirement that was in the 2002 Amended Incidental Take Statement from the 2006 Incidental Take Statement without replacing it with a meaningful standard to measure if, and when, the incidental take of the Snail Kite will be exceeded under high water conditions.

68.   The Incidental Take Statement in the 2006 Biological Opinion also differs from the previous one by allowing the taking of the Wood Stork, and even the Sparrow, for which the RPA is supposed to provide favorable conditions. The 1999 Biological Opinion, which declared jeopardy on the Experimental Program, predicted that there would be no taking Sparrows after 1999. FWS does not adequately explain, nor properly analyze, how the taking of Sparrows from subpopulation A, which has declined under the IOP RPA, does not conflict with its prior jeopardy opinion.

69.   The Incidental Take Statement in the 2006 Biological Opinion now anticipates that the take of Snail Kites, Wood Storks, and Sparrows is expected to occur annually under the RPA until the Combined Structural and Operational Plan ("CSOP"), the water management plan that allegedly will replace the RPA is implemented in 2011, which is at least four years more than the 2007 date reported in the 2002 Amended Biological Opinion.

70.   The Incidental Take Statement in the 2006 Biological Opinion fails to specify the amount or extent of the take in the form of a specific number and/or with the required degree of exactness and is devoid of any meaningful threshold that would indicate when an unacceptable level of take has occurred.

71.   The Snail Kite area to be monitored in the Incidental Take Statement in the 2006 Biological Opinion does not take into account the full impact that the RPA could have on the Snail

Kite and its range, which includes Lake Okeechobee, the estuaries, and other areas.

72.   The Incidental Take Statement in the 2006 Biological Opinion fails to adequately analyze the cumulative, and individual, effects of damage occurring from high water impacts, coupled with the damage that would be caused by the RPA, in evaluating the impacts on the Snail Kite and its critical habitat.

73.   The Incidental Take Statement in the 2006 Biological Opinion for the Snail Kite contains inadequate terms and conditions, which FWS claims are non-discretionary, that will result in the "alarming" decline in the Snail Kite population to continue without mitigating for the high water impacts that are a threat to its survival, and/or that will not ensure timely compliance or trigger a reinitiation of consultation.

74.   Despite the alarming 50% decline in the Snail Kite population, the Incidental Take Statement for the Snail Kite in the 2006 Biological Opinion deletes the high water criterion trigger that was present in the 2002 Amended Incidental Take Statement to determine when an exceedance of incidental take had occurred, and now does not contain any specific measurable criterion to determine an exceedance of incidental take of the Snail Kite under high water conditions, nor does the documents discuss whether the five year rolling average report required by the 2002 Amended ITS was ever conducted to see if the IOP RPA had exceeded the incidental take for the Snail Kite.

75.   The Incidental Take Statement in the 2006 Biological Opinion contains certain terms and conditions for the Snail Kite and the Wood Stork that are too vague and confusing to be a meaningful standard upon which compliance can be based or to trigger reinitiation of consultation. Such vague and confusing provisions leaves unfettered discretion to the FWS to interpret them and leave the Corps, and the public, with no method to gauge performance.

76.   The Incidental Take Statement does not document the exact number of Snail

Kites.,Wood Storks, or Sparrows expected to be taken under the RPA; fails to contain reasonable and prudent measures with implementing terms and conditions that are clear, precise and enforceable; and fails to include reporting requirements that ensure timely compliance.

77.     The Incidental Take Statement requires reinitiation of consultation if new information reveals effects on the proposed structures and operations that may affect listed species or critical habitat in a manner or to an extent not considered, but fails to contain any meaningful, measurable trigger when such consultation would be required.

78.     The terms and conditions of the Incidental Take Statement in the 2006 Biological Opinion are not adequate to ensure that the critical habitat of the Snail Kite will not be adversely modified and/or that the continued existence of the Snail Kite will not be jeopardized and/or that its recovery will not be impeded by four or more years of the RPA.

79.     The 2006 Biological Opinion recognizes that the IOP RPA will be in place for at least another four years, but fails to acknowledge that the Modified Water Deliveries Project and Combined Structural and Operation Plan ("CSOP") deadlines have been delayed numerous times and does not contain any analysis of what impact this will have on the FWS "optimistic"predictions if it is further delayed. Nor is there any analysis in the 2006 Biological Opinion that shows whether CSOP will even improve the hydrological conditions and/or habitat for the endangered species or allow for the recovery of the habitat and the species.

80.     The 2006 Biological Opinion fails to analyze the impact of the full duration of unnatural hydrological conditions on the Snail Kite and other endangered species that will be perpetuated by the FWS' Proposed Rule for the revision of the critical habitat for the Cape Sable Seaside Sparrow issued October 31, 2006, which includes a hydrological management objective that will institutionalize the current unnatural water management regime and prevent the restoration of

natural flows and levels under the Comprehensive Everglades Restoration Plan ("CERP").

81.    The 2006 Biological Opinion, and its RPA and Incidental Take Statement, and the predecessor 1999 Biological Opinion and 2002 Amended Biological Opinion, have caused, and will continue to cause, severe degradation of the Tribal Everglades in WCA 3A, including destruction of the tree islands and biodiversity, and irreversible ecological harm to the critical habitat of the endangered Snail Kite, as well as harm to the Tribe's entire culture and way of life through unacceptably and unnaturally sustained high water levels there

82.    The 2006 Biological Opinion, and the RPA contained within, will continue to cause unacceptably high sustained water levels in WCA 3A, which when analyzed with past actions demanded by FWS that close the gates and block the natural flow of water south out of the central Everglades, is causing, and will continue to cause, cumulative irreparable harm to the endangered Snail Kite and its critical habitat in WCA 3A, and to Tribal lands in this area of the Everglades, including natural resources and wildlife resources, which are vital to the Tribe's culture and way of life, and other parts of the human environment and its endangered species.

83.    The FWS RPA in the 2006 Biological Opinion results in the closing of the S-12A, S-12B, and S-12C structure gates and the S-333 and S-334, which causes sustained high water levels in WCA 3A and exacerbates high water in WCA 2 and Lake Okeechobee, as well as damaging discharges to the St. Lucie and Caloosahatchee estuaries, which also adversely impact endangered species there that have not been analyzed by the FWS.  The 2006 Biological Opinion failed to adequately analyze, and in some cases did not analyze at all, the impact the RPA would have on the other areas of the Snail Kite critical habitat, and other endangered species that inhabit these areas, including some areas and species that had been analyzed in the 1999 Biological Opinion.

84.    The 2006 Biological Opinion contains a woefully inadequate analysis of the

environmental baseline for the Snail Kite, Wood Stork, and the other endangered species.

85.     The Snail Kite Demography Annual Report 2003 prepared for the FWS demonstrates that there has been an alarming 50% decline in the Snail Kite population from 1999 to 2003 during the years of ISOP and IOP. The report shows that in 1999 the Snail Kite population was estimated at 3,577 birds in 1999 and dropped to 1,610 birds in 2003. While the 2006 Biological Opinion discusses the population decline, the relevant 2003 report is not listed as a FWS reference. Nor did the FWS mention that the report stated that, "the snail kite population in Florida is going through an alarming declining phase; that the report presents "trend data through time that are alarming and indicative of reproductive and population declines that place the population at considerable risk;" and that it contained a recommendation that the scientists would be supportive of a reduction of water depths and hydroperiods, particularly in the western sector of WCA 3A.

86.     The Snail Kite Demography Annual Report 2004 prepared for the FWS again states that recent demographic results show "alarming trends concerning the Snail Kite population in Florida." The report states that while population estimates for 2002 and 2003 suggest a possible stabilization, and that while the population for 2004 is greater (but not significantly), the scientists can not infer that the population is actually recovering. The 2006 Biological Opinion fails to reference this relevant report and does not discuss or analyze its findings that: the water regulation in the WCAs has the potential to directly affect the survival of sub-adults and even adults, possibly resulting in further declines and increasing extinction possibilities; that most kites do not move as freely as previously thought between wetlands; or the recommendation that the current regulation schedule in WCA 3A is "problematic to kites" and "needs to be reconsidered for some flexibility to mitigate its potential negative impacts to kites."

87.     The Snail Kite Demography Annual Report 2005 prepared for the FWS opines that:

the estimate of population size for the year 2005 does not indicate any significant recovery; that reproductive success was at its lowest for the 1992-2005 period, and that no kites fledged out of WCA 3A in 2005. The report goes on to state that this trend of lowered reproduction raises concerns regarding the population sustainability, and reiterates the observation that most kites do not move as freely as previously thought among wetlands which are isolated by extensive areas of unsuitable habitats. While the 2006 report is referenced in the 2006 Biological Opinion, many of its findings are not discussed or analyzed, including the observation that "Several researchers have raised their concerns about potentially adverse effects of flooding in WCA 3A and that in recent years "water levels in WCA 3A have been maintained at alarmingly high levels." Nor does the 2006 Biological Opinion discuss, or analyze, the report's recommendation that because WCA 3A is currently so critical to kites that the existing regulation schedule should be modified.

88.     Despite the "alarming" and "drastic" decline in the Snail Kite population described in the Snail Kite Annual Demography Reports for 2003, 2004 and 2005 that were prepared for the FWS, and the observation that water levels in WCA 3A being maintained at "alarmingly high levels" and the recommendation that they be reduced, the FWS failed to address the recommendations of these scientists in the 2006 Biological Opinion and/or Incidental Take Statement and, instead, adopted an RPA and ITS that will result in continued "alarmingly high" water levels for another four years. Contrary to the evidence and the science, the FWS 2006 Incidental Take Statement also fails to contain any measurable criterion to determine when the incidental take of the Snail Kite would be exceeded under high water conditions.

89.     FWS is fully aware that the nine years of FWS-demanded gate closings has resulted in a decrease, not an increase, in the number of Sparrows in western subpopulation A. The 2006 Biological Opinion now concludes that IOP RPA will take Sparrows in sharp contrast to the 1999

Biological Opinion that predicted that there would be no taking of Sparrows after 1999.

90.     The Sparrow sub-population A estimates in the 2006 Biological Opinion show that there were more Sparrows in Subpopulation A in 1997 under the Experimental Program on which FWS declared jeopardy, than there are now.  The Snail Kite population estimates show that the gate closings, which have not only resulted in a decline in the Sparrow subpopulation A, also correspond with a 50% decline in the endangered Snail Kite population and significant degradation of its designated critical habitat in WCA 3A.  The 2006 Biological Opinion not only predicts that IOP will take Sparrows, but that four more years of IOP is not expected to improve the status of subpopulation A. Nowhere in the 2006 Biological Opinion does it contain a new analysis of the FWS failed gate closing hypothesis or any analysis of alternatives that would be more beneficial for the Snail Kite, the Wood Stork, and the Sparrow itself.

91.     The Comprehensive Everglades Restoration Plan ("CERP") is a Congressionally approved plan, which includes the restoration of more natural water levels in the system, that will be implemented by the federal and state government and will take decades to implement.

92.     The FWS is aware that modeling conducted with the Natural Systems Model ("NSM") shows that water levels in the Sparrow western subpopulation A area will be higher under CERP than the unnaturally low levels that FWS has demanded under the RPA in the 2006 Biological Opinion.

93.     The FWS is  aware that  modeling conducted with the Natural Systems Model ("NSM") shows that water levels in the Sparrow western subpopulation A area will be higher under CERP  than the unnatural levels that the FWS is proposing for this area under its Proposed Rule to revise the critical habitat for the Cape Sable seaside sparrow, which contains a hydrological management objective that would maintain unnatural levels for subpopulation A and institutionalize

high water levels in WCA 3A. FWS failed to analyze the impacts of the longer duration of these hydrological conditions in the 2006 Biological Opinion.

94.     The FWS based its analysis in the new 2006 Biological Opinion on the assumption that the Combined Structural and Operational Plan ("CSOP"), the water management control plan that allegedly will replace the RPA, would be implemented no later than 2011. There is no assurance that the long-delayed CSOP will be completed within the four years, or even completed at all, nor evidence that it will actually create the improved hydrological conditions referenced by the FWS.

95.     Despite the dire acknowledgment in the 2006 Biological Opinion that the Snail Kite population has declined by 50% (3,000 - 1,400 birds from 1999-2002; 1,700 birds in 2004 and 2005; 1,600 birds in 2006); that apple snail densities dropped by 82% from 2003-2004 in southern WCA 3A due to high water levels and apple snail abundance and foraging conditions will be poor under IOP; and that several lines of evidence suggest that the Snail Kite population has declined and may be continuing to decline; the FWS makes an unanalyzed claim based on stale data, and contrary to recent scientific evidence that the Snail Kite is up against the "hydrological wall" and can not move as freely as previously thought, that the Snail Kite can either wait out the unfavorable conditions or move to other areas.

96.     The 2002 Amended Biological Opinion observed that continuous flooding of wetlands for more than four or five years is associated with the degradation of Snail Kite foraging habitat, and that the Snail Kite in WCA 3A has increasingly moved their nesting activity to higher elevations as lower elevation habitat areas have been degraded by high water levels, but neither of these observations, nor any analysis of them, was contained in the 2006 Biological Opinion that now acknowledges that IOP will now continue beyond five years and up to eleven years.

97.     The scientific observation in the 2002 Amended Biological Opinion that the

endangered Snail Kite is up against a "hydrological wall" by being forced to move their nesting activity to areas of higher elevation and short hydroperiods and that it could increasingly run out of suitable nesting habitat in their critical habitat in WCA 3A was not contained in the 2006 Biological Opinion nor otherwise analyzed by the FWS.

## COUNT I

### The FWS Biological Opinion Is Arbitrary and Capricious and Contrary to Law

98.    The allegations of paragraphs 1 through 97 are incorporated herein.

99.    FWS has violated the Endangered Species Act by, among other things, failing to use its authorities to promote the recovery of the Snail Kite; by failing to avoid jeopardy to the Snail Kite; and by failing to avoid destroying or adversely modifying the Snail Kite's designated critical habitat in WCA 3A.

100.    When preparing a Biological Opinion, FWS must, among other things, review all relevant information; evaluate the current status of the listed species; and evaluate the effects of the action on the listed species using the best scientific and commercial data available. 16 U.S.C. § 1536 (a)(2) and 50 C.F.R.§ 402.14.

101.    Federal agencies are required to formulate a Biological Opinion as to whether a proposed action is likely to jeopardize the continued existence of the listed species or result in the destruction or adverse modification of the critical habitat. 16 U.S.C. § 1536 (a)(2) and (b) (3)A; 50 C.F.R. § 402.02.

102.    The Biological Opinion must also analyze whether an action may jeopardize a species by appreciably reducing the species' prospects of recovery, as well as the survival. 50 C.F.R. § 402.02.

103.    The 2006 Biological Opinion is arbitrary, capricious and not in accordance with law

26

in that, among other things, it:

    a)     is not based on the best scientific and commercial data available;

    b)     does not analyze the impact on all parts of the action area;

    c)     does not include a sufficient analysis of the status of the species impacted by the agency action;

    d)     fails to contain a sufficient analysis of the environmental baseline;

    e)     fails to contain a sufficient analysis of the effects of the agency action; and

    f)     fails to contain a sufficient analysis of the cumulative effects of other actions.

104.    In preparing its 2006 Biological Opinion, the agency failed to consider all relevant factors, and did not articulate a rational connection between the facts found and the choices made.

105.    The no jeopardy determination and critical habitat analysis for the Snail Kite in the 2006 Biological Opinion are arbitrary and capricious and contrary to law.

106.    The 2006 Biological Opinion, the RPA and ITS, fail to adequately analyze the environmental baseline of all human impacts, including cumulative impacts, as required by 50 C.F.R. § 402.02.

107.    The 2006 Biological Opinion fails to include an adequate analysis of the effects of the RPA on the species, added to the environmental baseline, and all cumulative effects to determine whether in light of the status of the species, the RPA would cause jeopardy or adverse modification.

108.    The 2006 Biological Opinion did not properly analyze the direct and indirect effects of the RPA on all threatened and endangered species in the action area, including the Snail Kite and the Wood Stork, and other endangered species.

109.    The 2006 Biological Opinion ignored the life cycle of the Snail Kite, which when

coupled with a badly degraded habitat and the impacts caused by more than a decade of high water resulting from past and present operation of the RPA, and other FWS-dictated actions, could result in the extinction of the species.

110.    The 2006 Biological Opinion does not contain an adequate analysis of the cumulative effects of all future state and local projects in the area and does not even mention the State's involvement in ACCELER8 and the Comprehensive Everglades Restoration Plan ("CERP").

111.    The 2006 Biological Opinion concludes, without adequate analysis, that the RPA is not likely to jeopardize the endangered Wood Stork or adversely modify its critical habitat.

112.    The 2006 Biological Opinion fails to properly analyze the current status of all threatened and endangered species in the action area, and neglects to even consider some that were previously analyzed in the 1999 Biological Opinion.

113.    The 2006 Biological Opinion makes determinations regarding whether the RPA action is likely to adversely modify the critical habitat of listed species, such as the Snail Kite and the Wood Stork, without properly examining the impact of such action on the survival and recovery of those species or other endangered species.

114.    The analysis in the 2006 Biological Opinion concerning adverse modification to the habitat of the Snail Kite and the Wood Stork is defective in that it fails to adequately analyze the appreciably diminishing quality of critical habitat and other habitat necessary for the survival and recovery of the listed endangered species.

115.    The 2006 Biological Opinion contains an improper baseline analysis in that it fails to consider the impact of all other federal, state, private and other actions on the listed species.

116.    The FWS failed to follow DOI Secretarial Order #3206 entitled, *American Indian*

*Tribal Rights, Federal Tribal Trust Responsibilities, and the Endangered Species Act,* which is contained in the FWS endangered species handbook. Order #3206 requires consultation with the Miccosukee Tribe of Indians on the 2006 Biological Opinion, RPA and Incidental Take Statement that FWS knew would adversely impact Tribal rights, lands, and natural resources, including the endangered Snail Kite that inhabits those lands as part of its critical habitat.

117. The Amended Biological Opinion fails to use the best available science to analyze the impacts to the endangered Snail Kite and its critical habitat, including but not limited to the failure to address the recommendation of scientists that prepared recent reports on the Snail Kite for the agency that the decline in the Snail Kite population is "alarming" and that water levels in WCA 3A were "alarmingly high" and should be reduced.

118. The FWS used an inadequate analysis and stale and incomplete data to reach the faulty conclusion in the 2006 Biological Opinion, which is contrary to the facts and the Recovery Plan for the Snail Kite, that the degradation of approximately 184,320 acres (20.9%) of the endangered Snail Kite's designated critical habitat for each of four years of the RPA would not adversely modify the designated critical habitat and/or jeopardize the continued existence of the Snail Kite.

119. The 2006 Biological Opinion improperly relied on uncertain, unproven, and unsupported predicted improvements to the critical habitat in WCA 3A to offset the critical habitat degradation (184,320 acres a year for four years) that could be caused by the RPA.

120. The 2006 Biological Opinion fails to adequately analyze the impacts of the RPA, including direct and indirect impacts, in the context of the aggregate and cumulative impacts of all of the activities that affect the Snail Kite and its entire range, including an analysis of the declining

population of the Snail Kite and the degraded condition of the critical habitat, in the context of the life cycle and migration pattern of this endangered bird.

121.    The 2006 Biological Opinion fails to fully consider the RPA's impact on all habitat necessary for the recovery of the Snail Kite, as required under the ESA.

122.    FWS conducted an inadequate jeopardy and critical habitat modification analysis by failing to analyze the impact the RPA is having on the endangered Snail Kite and all areas of its designated critical habitat, in light of scientific reports and the Snail Kite population has declined an "alarming" 50%, and that water levels in WCA 3A, its designated critical habitat, have been at "alarmingly high" levels.

123.    The Incidental Take Statement for the Snail Kite in the 2006 Biological Opinion is flawed in that it will result in the continuing significant decline of the Snail Kite population without any meaningful mitigation measures to address the known threat of high water to the species and/or to reverse the decline.

124.    The 2006 Biological Opinion and its Incidental Take Statement for the Snail Kite fails to contain a detailed analysis based on current science to the Service's absurd conclusion that the degradation of approximately 57.7% of the Snail Kite's designated critical habitat in WCA 3A (184,320 acres per year out of 319,078) will not result in adverse modification, especially in light of the FWS failure to address its previous prediction in the 2002 Amended Biological Opinion that 88,300 acres of Snail Kite critical habitat would be degraded by the IOP RPA.

125.    The 2006 Biological Opinion jeopardy analysis contains no adequate analysis of whether the RPA will appreciably reduce the likelihood of recovery of the Snail Kite and other endangered species and fails to analyze the RPA and Incidental Take Statement in relation to the

Recovery Plan for the Snail Kite, including as contained in the Multi-Species Recovery Plan, and/or adequately analyze how it would impact the recovery of the Snail Kite.

126.    The 2006 Biological Opinion and Incidental Take Statement are contrary to measures deemed necessary for the recovery of the Snail Kite in that, among other things, its adverse modification finding hinges on a monitoring plan that will not stop the exceedance of take under damaging high water conditions; contains no meaningful mitigation measures directed at reversing the significant population decline of the Snail Kite; and impermissibly ignores the recovery goal of critical habitat.  The conclusion that the degradation of 184,320 acres a year of Snail Kite critical habitat in WCA 3A (more than half the critical habitat there) will not jeopardize the Snail Kite or adversely modify its critical habitat is unsupported and harms the Snail Kite.

127.    The 2006 Biological Opinion is arbitrary, capricious and not in accordance with law in that, among other things, it contains an Incidental Take Statement for the Snail Kite, Wood Stork, and Cape Sable Seaside Sparrow that:

   a)     fails to specify the amount of take authorized;

   b)     fails to specify the impact of the taking on the affected species;

   c)     fails to specify appropriate reasonable and prudent measures to minimize such impacts; and,

   d)     fails to set forth sufficient terms and conditions.

128.    The Incidental Take Statement for the Snail Kite contained in the 2006 Biological Opinion:

   a)     fails to document the number of Snail Kites that have been taken under previous deviations (1997-2000) and ISOP (2000-2001) and the IOP RPA ( 2002- 2006);

31

b)      fails to identify the number of Snail Kites expected to be taken under the RPA from 2006 through 2011;

c)      fails to analyze how the number of Snail Kites taken and expected to be taken, will impact the survival of the species and its recovery;

d)      fails to contain the number of Snail Kites taken that will exceed the incidental take;

e)      eliminates the high water criterion test to determine when the take of Snail Kites has been exceeded under high water conditions;

f)      fails to contain an adequate high water criterion to adequately monitor any incidental take;

g)      allows a significant decline in the Snail Kite population before instituting any meaningful mitigation measures which would address known threats to the species;

h)      fails to contain prudent measures with implementing terms and conditions that are clear, precise and enforceable; and

i)      does not include reporting requirements that ensure timely compliance and/or trigger reinitiation of consultation.

129.    Defendants issued the Incidental Take Statement without adequate evidence and analysis, or sufficient terms and conditions, to support the conclusion that such actions would not result in jeopardy to the endangered Snail Kite and/or adverse modification of its critical habitat.

130.    Defendants authorized an incidental take of the Snail Kite, without sufficient evidence or analysis necessary to ensure that the terms and conditions of the Incidental Take Statement were adequate to protect the species, could be complied with, including in a timely manner, and would trigger reinitiation of consultation. Furthermore, the Defendants omitted any high water criterion

trigger that would show if the incidental take had been exceeded, without any analysis and without divulging whether or not the reports required under the initial terms of the 2002 Amended Biological Opinion had shown whether or not the take of the Snail Kite had been exceeded.

131.    Defendants issued an Incidental Take Statement for the endangered Snail Kite without determining and/or estimating the actual number of Snail Kites that would be taken by the RPA in the entire range of the Snail Kite, and without an adequate analysis of whether the loss of endangered birds would jeopardize the Snail Kite's continued survival and/or impede its recovery.

132.    Defendants violated the ESA by using a narrow definition of the Snail Kite area to be monitored under the Incidental Take Statement, and which does not take into account the broad impact of the RPA on the Snail Kite and its entire designated critical habitat, including on Lake Okeechobee and other areas.

133.    Defendants, who acknowledge in the 2002 Amended Biological Opinion that the Snail Kite is up against a hydrological wall by being forced to move nesting activity to areas of higher elevation and short hydroperiods and could increasingly run out of suitable nesting habitat in WCA 3A, did not include this observation in its 2006 Biological Opinion and issued the ITS without adequate evidence and analysis to demonstrate that continued degradation of Snail Kite critical habitat for more than five years would not result in jeopardy to the Snail Kite or adverse modification.

134.    The FWS' flawed position, which continues in the 2006 Biological Opinion, that the flow of water through the S-12 gates is causing the decline of subpopulation A of the Cape Sable Seaside Sparrow and jeopardy to the species and that closing the gates will help the Sparrow, is not based on the best scientific and commercial information available, as required by Section 7 of the

ESA. It is also controverted by population estimates that show this Sparrow subpopulation has actually decreased under nine years of gate closings, and the fact that the FWS has now issued an incidental take for the Sparrow under the IOP RPA and admits that four more years of IOP operations is not expected to improve the status of Subpopulation A.

135.    Defendants' failure to use the best scientific and commercial information available in the 2006 Biological Opinion, which perpetuates the errors of the flawed 1999 and 2002 Biological Opinions, has resulted in FWS once again adopting an RPA that closes gates and stops the flow of water through the Everglades, resulting in flooding and sustained high water levels in WCA 3A and other areas of the Everglades ecosystem, thereby endangering and threatening the Snail Kite and its critical habitat there, and other endangered species and their habitat, in violation of the ESA. Such actions have caused, and will continue to cause, harm to Tribal lands and natural resources, as well as the culture and way of life of the Miccosukee Tribe that depends on a healthy Everglades.

136.    Defendants' 2006 Biological Opinion is based on a previous jeopardy determination on the Sparrow that was based on an inadequate review of the scientific literature, an incorrect survival rate ( FWS now admits it is at least 61% rather than the 50% used in the jeopardy determination), and incorrect mobility determinations. Despite this, the 2006 Biological Opinion failed to revisit the jeopardy determination using the increased survival rate and mobility information for the Sparrow to determine whether jeopardy exists.

137.    The 2006 Biological Opinion ignores relevant information concerning the impacts of predation and Hurricane Andrew on subpopulation A of the Sparrow; fails to conduct an analysis with new information on the Sparrow and/or conduct a new jeopardy analysis using new information which supported prior warnings from scientists that FWS was using incorrect mobility information

34

and survival estimates in its biological analyses; and refused to consider relevant scientific comments concerning the Sparrow and alternative actions that should be taken for subpopulation A that would be less damaging to the Everglades and other endangered and threatened species.

## PRAYER FOR RELIEF AS TO COUNT I

Plaintiff requests that the Court grant the following relief as to Count I:

(a)   Declare that the 2006 Biological Opinion and its Incidental Take Statement are arbitrary, capricious, and not in accordance with law;

(b)   Declare that Defendants acted arbitrarily and capriciously and contrary to law by issuing an Incidental Take Statement that fails to contain reasonable and prudent measures with implementing terms and conditions that are clear, precise and enforceable; fails to include reporting requirements necessary to ensure timely compliance and trigger reinitiation of consultation; and fails to require mitigating measures to ensure that IOP will not jeopardize the survival of endangered species.

(c)   Declare that Defendants failed to follow its own policies and regulations by failing to consult with the Miccosukee Tribe as directed by Secretarial Order #3206 in preparing their Amended Biological Opinion, RPA, and ITS;

(d)   Remand the 2006 Biological Opinion to Defendants and require that they use the best available science, consult with the Miccosukee Tribe, and otherwise comply with the ESA when revising it;

(e)   Order Defendants to gather the necessary scientific data, and conduct the required scientific analysis necessary to determine whether the issuance of

the ITS will not jeopardize the Snail Kite and/or modify its designated critical habitat and/or impede its recovery;

(f)     Enjoin Defendants from using its 2006 Biological Opinion, RPA, and the ITS for the Snail Kite until they comply with the ESA;

(g)     Award Plaintiff its reasonable costs and attorney fees;

(h)     Provide such further relief as the Court deems just and proper.

## COUNT II

### FAILURE OF DEFENDANTS TO COMPLY WITH ITS  DUTY
### TO CONDUCT ADEQUATE CONSULTATION UNDER SECTION 7 OF THE ESA

138.    The allegations of paragraphs 1 through 137 are incorporated herein.

139.    Section 7(a)(1) requires the Secretary of the Interior ("Secretary") to review programs administered by him and to utilize such programs in furtherance of the purposes of the ESA.

140.    The Secretary's ESA statutory responsibilities include the listing and delisting of species, the designation and modification of critical habitat (ESA § 4(a)), developing and implementing species recovery plans (ESA § 4(f)); and the development of conservation measures (such as RPAs) through its biological opinions (ESA § 7(b)(3)).

141.    In addition to the responsibilities imposed on other Federal agencies pursuant to § 7(a)(1), § 7(a)(2) requires them  to consult with the Secretory to insure that actions authorized, funded, or carried out by that agency are not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of areas designated as critical habitat.  In fulfilling these requirements, the agency is to use the best scientific and commercial data available.

142.    A Biological Opinion issued as a result of such consultation should address both the jeopardy and critical habitat prongs of section 7 of the ESA by considering the current status of the

species, the environmental baseline, the effects of the proposed action, and the cumulative effects of the proposed action. 50 § C.F.R. 402.14 (g) (2)-(3).

143.    During the Section 7 consultation, the consulting agency must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R.§ 402.14(g)(3).

144.    The findings and requirements of a Biological Opinion and RPA and Incidental Take Statement are, in practice, binding on the action agency and constitute final agency action.

145.    When new information exists indicating that the premises upon which the Secretary based his findings in a Biological Opinion concerning an endangered species are flawed, the Secretary has the duty to request the reinitiation of consultation to fulfill his responsibilities under § 7(a)(1) and 50 C.F.R. § 402.16.

146.    Despite new information that existed in the form of modeling of the FWS IOP RPA, Alternative 7R, which showed an increase in the numbers of weeks of sustained high water in WCA 3A that had not been analyzed in the 2002 Amended Biological Opinion, the FWS failed to require the Corps to reinitiate consultation on the impacts on the endangered Snail Kite and its critical habitat until the Court ordered the Corps to conduct an SEIS using the modeling.

147.    On or about June, 2006, the FWS required the Corps to reinitiate consultation on the IOP RPA.

148.    A review of the 2006 Biological Opinion and Incidental Take Statement that resulted from that consultation shows that the FWS did not adequately discharge its duties under Section 7(a)(2) of the ESA in that, among other things, it failed to consult using the best scientific and commercial data available, failed to consider important aspects of the problem, and failed to fulfill its rigorous duty under Section 7 to ensure that the implementation of the RPA did not result in

jeopardy or adverse modification.

149.    Defendants failed to conduct adequate consultation in that it did not require the Corps to report, nor did it discuss any such report in the Biological Opinion, on whether or not the RPA had exceeded the high water criterion and incidental take for the Snail Kite contained in the 2002 Amended Incidental Take Statement, and by improperly removing the high water criterion trigger for an exceedance of Snail Kite incidental take from the new 2006 Incidental Take Statement.

150.    Defendants failed to conduct adequate consultation in that FWS did not adequately analyze the impact of the RPA on both the survival and recovery of the endangered Snail Kite and other endangered species in their no jeopardy and adverse modification determinations.

151.    Defendants failed to conduct a proper baseline and cumulative effects analysis and cannot fulfill its consulting responsibility by simply listing relevant activities without an adequate analysis of the individual and cumulative impacts of such activities.

152.    Defendants failed to conduct adequate consultation, among other things, because it did not analyze how an RPA designed to benefit the Sparrow could take Sparrows, when the previous 1999 Biological Opinion claimed that none would be taken after 1999. Defendants also failed to analyze its failed hypothesis that the closing of the S-12 gates would cause sparrow subpopulation A to flourish in light of the fact that Sparrow subpopulation A has decreased under the FWS mandated gate closings, and will continue to do so under the RPA, as recognized by the incidental take that FWS has now issued for the Sparrow.

## PRAYER FOR RELIEF AS TO COUNT II

Plaintiff requests that the Court grant the following relief as to Count II:

(a)    Declare that Defendants failed to adequately discharge its duties under Section

38

7 of the ESA to conduct adequate consultation on the impacts that the IOP RPA would have on the endangered Snail Kite and its critical habitat in WCA 3A and other endangered species, which resulted in a faulty 2006 Biological Opinion and Incidental Take Statement;

(b)     Declare that Defendants failed to fulfill its rigorous duty under Section 7 of the ESA to ensure the implementation of the RPA would not result in jeopardy or adverse modification of critical habitat for the Snail Kite and other endangered species or impede the recovery of the Snail Kite;

(c)     Order Defendants to comply with Section 7 of the ESA and to reinitiate consultation with the Corps on the IOP RPA and its impacts on the endangered Snail Kite and its designated critical habitat, including on its recovery, and issue a new Biological Opinion and ITS;

(d)     Order Defendants to reinitiate consultation with the Corps on the RPA's impact on other endangered species and their designated critical habitat, including on their recovery;

(e)     Order Defendants to gather the necessary scientific data, and conduct the required scientific analysis, when reinitiating consultation on the RPA and the ITS;

(f)     Enjoin Defendants from using the 2006 Biological Opinion, RPA, and the ITS until adequate consultation under the ESA is concluded;

(g)     Award Plaintiff its reasonable costs and attorneys fees;

(h)     Provide such further relief as the Court deems just and proper.

39

## COUNT III

## VIOLATIONS OF SECTION 9 OF THE ENDANGERED SPECIES ACT RELATING TO THE INCIDENTAL TAKE STATEMENT AND THE ENDANGERED SNAIL KITE

153.    The allegations of paragraph 1 through 152 are incorporated herein.

154.    Section 9 of the ESA makes it unlawful to "take" any endangered species. 16 U.S.C. 1538 (a)(1)(B).  The statute defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, collect, or to attempt to engage in any such conduct."  Id. at  § 1532(19).  The Service's regulations further define "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavior patterns, including breeding, feeding, or sheltering."  50 C.F.R.  § 17.3.

155.    Defendants are violating Section 9 of the ESA, and its implementing regulations, by taking Snail Kites and/or issuing an Incidental Take Statement that will result in the unrestricted, unlawful taking of endangered Snail Kites under the high water conditions that FWS knows are a threat to the Snail Kite's survival, critical habitat, and recovery.

156.    Despite Defendants' admission in the 2006 Biological Opinion that the Snail Kite population has declined 50% during the years of ISOP and the IOP RPA, and that sustained degradation of wetland habitat and a change in hydrologic conditions are a threat to the Snail Kite's survival, the FWS adopted an Incidental Take Statement that will result in the unmeasurable and unrestricted taking of Snail Kites under high water conditions and the significant degradation of its critical habitat.

157.    The Amended Incidental Take Statement contained in the 2002 Biological Opinion contained a high water criterion test, that even though inadequate, was supposed to measure when an

incidental take of the Snail Kite had been exceeded and that read as follows: "Thus, if actual operations of IOP-Alt. 7R produces higher water levels than those predicted to occur via the SFWMM in Indicator Regions 14 (Southern WCA 3A) and 19 (Eastern WCA 3A), as measured by a gauge or gauges mutually agreed upon by the Service and the Corps as compared to a five-year rolling average of the model output for those indicator regions, then the Corps will have exceeded the incidental take authorized by this amendment."

158.    The Alternative 7R modeling FWS purportedly used to prepare the 2006 Biological Opinion and Incidental Take Statement shows that there are many more weeks of sustained high water in the Indicator Region 14 that was to be monitored for the Snail Kite than was predicted to occur in the 2002 Biological Opinion. Yet, the 2006 Incidental Take Statement fails to analyze the amount of habitat that has been previously degraded by the higher water levels of the IOP RPA nor does it analyze whether the incidental take of the Snail Kite was exceeded under past operations.

159.    The Incidental Take Statement in the 2006 Biological Opinion, which the FWS claims supersedes the 2002 Biological Opinion, contains a vague and obscure statement that, "Instead of using the 5 year rolling average of water levels of two indicator regions to determine incidental take as in the Service's 2002 Biological Opinion, we will allow for real time monitoring versus assessing incidental take over a longer period."   This statement is impermissibly vague and sets no clear guidelines for monitoring that establishes a clear methodology to determine if and/or when the take of Snail Kite has been exceeded under high water conditions and the amount of such take.  Nor is there any place in the new Incidental Take Statement that identifies, or establishes, a high water criterion test or trigger at which the incidental take of the Snail Kite will be exceeded or even establishes any exceedance of take due to sustained high water levels.

41

160.    By removing the high water criterion test that was supposed to measure when the incidental take of Snail Kites would be exceeded under past IOP RPA implementation, and by failing to replace it with concrete measurable  trigger to determine whether an exceedance of incidental take for the Snail Kites has occurred under future IOP RPA high water conditions, the Incidental Take Statement will result in the unrestricted taking of Snail Kites under high water conditions.

161.    Defendants' failure to have a high water criterion trigger at which the incidental take of Snail Kites would be exceeded in the  Incidental Take Statement will result in the unrestricted taking of Snail Kites under high water conditions and significant degradation of its designated critical habitat, in violation of Section 9 of the ESA.

162.    Defendants' 2006 Biological Opinion admits that the endangered Snail Kite population has declined 50% during the years of the ISOP and the IOP RPA.

163.    Defendants' 2006 Biological Opinion state that threats to the Snail Kite's survival include loss of wetlands habitats and degradation of wetland habitats.

164.    Defendants 2006 Biological Opinion states that IOP operations may result in a Snail Kite nesting failure of up to 40% in southern WCA 3A.

165.    Defendants 2006 Biological Opinion admits that 40% of Snail Kite critical habitat has been degraded since it was designated in 1977.

166.    The Incidental Take Statement in the 2002 Amended Biological Opinion predicted the degradation of 88,300 acres (10.5%) of Snail Kite critical habitat in WCA 3A under the IOP RPA. The Service's faulty analysis in the 2002 Incidental Take Statement that this significant habitat degradation was not likely to jeopardize the continued existence of the Snail Kite, or adversely modify its designated critical habitat, was based on stale data and the incorrect assumption that Snail

42

Kite population numbers were increasing.

167.  The FWS 2006 Biological Opinion now admits that the Snail Kite has declined 50% during the years of ISOP and the IOP RPA.  Despite this "alarming" and "drastic" decline in the Snail Kite population, the Incidental Take Statement will result in the significant degradation of 184,320 acres of Snail Kite critical habitat per year for four years in WCA 3A (which is 21.9% of the 841,635 acres of total Snail Kite critical habitat and 57.7% of the 319,078 of its WCA 3A critical habitat).

168.  Defendants' Incidental Take Statement will allow the continued decline of the Snail Kite population to continue in that, among other things, it fails to contain sufficient terms and conditions to meaningfully mitigate for the impacts, especially high water, that cause the incidental take and/or does not contain meaningful reasonable and prudent measures to protect the Snail Kite, all in violation of Section 9 of the ESA.

169.  Defendants have a duty under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, to protect endangered species and their habitat, including a duty to conserve endangered species and threatened species.

170.  Defendants' failure to follow the mandates of the ESA in issuing its Incidental Take Statement will result in the unrestricted take of Snail Kites under high water conditions; will allow the continued decline of the Snail Kite population; and will significantly degrade and adversely modify Snail Kite designated critical habitat in WCA 3A, which constitutes a taking under Section 9 of the ESA.

### PRAYER FOR RELIEF AS TO COUNT III

Plaintiff requests that the Court grant the following relief as to Count III:

(a)  Declare that Defendants violated Section 9 of the ESA by issuing an Incidental

Take Statement that will, among other things, result in the unrestricted take of the Snail Kites under high water conditions and the significant degradation of Snail Kite critical habitat in WCA 3A;

(b)    Declare that Defendant's Incidental Take Statement allows the continued decline of the Snail Kite population without sufficient terms and conditions to mitigate for the impacts, especially high water, that cause the incidental take and/or does not  contain meaningful reasonable and prudent measures to protect the Snail Kite, all in violation of Section 9 of the ESA;

(c)    Enjoin Defendants from using its Incidental Take for the Snail Kite, until they comply with the ESA and ensure that their actions or inactions will not result in the unlawful taking of Snail Kites;

(d)    Award Plaintiff its reasonable costs and attorneys fees;

(e)    Provide such further relief as the Court deems just and proper.

## COUNT IV
## VIOLATIONS OF THE APA UNDER AND THE ESA

172.    The allegations of paragraphs 1 through 171 are incorporated herein.

173.    Due to Defendants' knowing and conscious failure to comply with the Endangered Species Act ("ESA"), Plaintiff has suffered legal wrongs because of agency action.  Plaintiff is adversely affected and aggrieved by agency action within the meaning of the Administrative Procedures Act, 5 U.S.C. § 702.

174.    Defendants' knowing and conscious failure to comply with the ESA in issuing its 2006 Biological Opinion, including the RPA and Incidental Take Statement, is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction,

44

authority or limitations, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706.

175.    The 2006 Biological Opinion, including the RPA and Incidental Take Statement, constitutes a final agency action that is arbitrary and capricious, an abuse or discretion, or otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706.

176.    The Incidental Take Statement issued by FWS constitutes a final agency action that is arbitrary and capricious, an abuse or discretion, or otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706.

177.    Defendants have violated the APA by failing to follow their duty under the Endangered Species Act to conserve threatened or endangered species and by failing to ensure that their actions are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat, and/or impede the recovery goal of endangered species by their actions alleged herein, in violation of the ESA.

178.    Defendants' knowing and conscious circumvention of the administrative process required by the ESA in its adoption of the 2006 Biological Opinion, including the RPA and ITS, is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA.

### PRAYER FOR RELIEF AS TO COUNT IV

(a)    Declare that the Defendants acted in an arbitrary and capricious manner, and contrary to law, in  adopting the 2006 Biological Opinion, including the RPA and the ITS contained therein, in violation of the APA;

45

(b)     Remand the Biological Opinion and ITS to Defendants and order them to

comply with the ESA and the APA when modifying it;

(c)     Declare the FWS 2006 Biological Opinion contrary to law and set it aside

until such time as Defendants comply with the ESA and the APA, so as to

prevent further harm to the environment, including to the endangered Snail

Kite and its designated critical habitat;

(d)     Provide such further relief as the Court deems just and proper

Respectfully submitted,
**LEHTINEN, VARGAS & RIEDI, P.A.**
Attorneys for Plaintiff
7700 North Kendall Drive, Suite 303
Miami, Florida 33156
(305) 279-1166
(305) 279-1365 (FAX)
ksb@lehtinenlaw.com

By: _____
DEXTER LEHTINEN, ESQ.
Florida Bar No. 265551


By: _____
KELLY S. BROOKS, ESQ.
Florida Bar No. 0493341

46

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of January, 2007, a true and correct copy of the Tribe's Second Amended Complaint was filed electronically with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Kelly S. Brooks

**Via CM/ECF:**
**Mark Brown**
U.S. Dept. of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7369
Washington, D.C. 20044-7369
FAX: (202) 305-0275
mark.brown@usdoj.gov
karen.johnson3@usdoj.gov

**Attorneys for Intervenors:**
**Richard Grosso**
ENVIRONMENTAL AND LAND USE LAW CENTER
Nova Southeastern University
Shepard Broad Law Center
3305 College Avenue
Ft. Lauderdale, FL 33314
FAX: (954)-262-3992
richard@elulc.org

**Via Regular U.S. Mail:**
**Attorneys for Intervenors:**
**Kyle A. Lonergan**                          **Bradford H. Sewell**
**Robert A. Bourque**                        NATURAL RESOURCES DEFENSE COUNCIL
**James G. Gamble**                          40 West 20th Street
SIMPSON, THACHER & BARTLETT    New York, New York 10011
425 Lexington Ave                              FAX: (212) 727-1773
New York, New York 10017-3954
FAX: (212) 455-2502

47