## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 05-23045-CIV-MOORE

MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA, a federally-recognized Indian tribe,

      Plaintiff,

v.

UNITED STATES OF AMERICA, U.S. FISH &
WILDLIFE SERVICE, et al.,

      Defendants.

_____/

**CLOSED
CIVIL
CASE**

## ORDER GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Federal Defendants' Motion for Summary Judgment (dkt # 131) and Plaintiff's Motion for Summary Judgment (dkt # 134). The Parties' cross motions for summary judgment stem from the Plaintiff's Second Amended Complaint (dkt # 76). Counts I, II, and IV, of the Second Amended Complaint (dkt # 76) are the only remaining claims.

UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## I. BACKGROUND

The Cape Sable Seaside Sparrow ("Sparrow") represents one out of eight subspecies of North American seaside sparrow. AR 3322 at 21 ( the "sparrow['s] distribution is limited to the short-hydroperiod wetlands at the bottom of the greater Everglades system"). The Sparrow is

protected under the Endangered Species Act of 1973. Id. The endangered Sparrow requires low water levels for nesting because Sparrows build their nests between four and eight inches above the water. Id at 23-24. Therefore, higher water levels in the Sparrows' nesting areas can diminish their success at nesting and procreation. Id ("[a]t water levels over 2 ft above ground surface, occurring in October 1995, even the majority of the vegetation in sparrow habitat is completely inundated, leaving sparrows with very few refugia") Id at 27. Further, "sparrows are generally sedentary and avoid forested areas, they are not likely to travel great distances to find mates or to find outlying patches of suitable habitat." Id at 25. Thus, according to the Fish and Wildlife Service ("FWS"), the survival of the endangered Sparrow depends largely upon maintaining a lower water depth within its habitat.[1]

The Everglades Snail Kite ("Snail Kite") bird, is the other endangered species that appears to be most at risk under the Interim Operating Plan and the currently contested 2006 Biological Opinion. The Snail Kite, like the Sparrow, is an endangered species under the 1973 Endangered Species Act. Id at 33. The Snail Kite's primary forage is the apple snail mollusk. Id at 35. The apple snail, and therefore the Snail Kite, thrives in areas that have "interdigitated areas of open water" that are between half of a foot to 4.3 feet deep. Id at 36. Increased water

_____

[1]     One group of Sparrows, labeled Subpopulation A, is considered crucial to maintenance of the species because it is separated from the other Sparrow subpopulations, which are located in close proximity to one another, and could all be wiped out by one local catastrophic event. Id at 66. Subpopulation A is located West of the Shark River Slough, while all the remaining populations are located to the East of the Slough. Id. at 29.

2

level in Snail Kite habitat negatively affects the birds because it reduces the number of attainable apple snails. Id at 61. ("High water levels result in reduced position and reduced growth rates of young snails, and fewer adult-size snails are available for snail kites.") Id at 69.[2] As a result, the maintenance of water levels in certain sections of the Everglades affects the viability of both the endangered Sparrow and Snail Kite.  Specifically, Sparrow Subpopulation A's critical habitat is located south of the Tamiami Canal, below the gates and locks, while one of the Snail Kite's critical habitats is located north of the Tamiami Canal in WCA 3-A.[3]  Therefore, in order to preserve the correct low water habitat Sparrow Subpopulation A requires, located south of the canal, water must be retained above the canal in WCA 3-A, which negatively affects the Snail Kite habitat.

On March 3, 2006, Plaintiff Miccosukee Tribe of Indians ("Plaintiff") filed an Amended Complaint (the "Complaint") (dkt # 30) seeking various forms of relief for an alleged faulty biological opinion dated March 28, 2002.  The Complaint alleges that in late 1997, the FWS began demanding the closure of certain gates along Tamiami Trail to stop the flow of water out

---

[2]    In addition, specific low water conditions also harms the Snail Kite because it makes nest predation easier and can force apple snails to aestivate (sleep beyond the Snail Kite's grasp). Id at 69.

[3]    The Snail Kite has eight critical habitat areas, four of which are over 100,000 acres, but approximately 40% of the Snail Kite's original habitat has suffered some degradation.  Id at 34.

of WCA-3A[4], to benefit the endangered Sparrow located downstream to the south. Compl. at 7. Plaintiff alleges that the closing of these gates has resulted in harm to both Plaintiff and endangered species, specifically the Snail Kite and its critical habitat. Id. The closing of the gates and the subsequent restriction of water flow may keep water levels behind the gates abnormally high. This increased water depth, as described above, could reduce the number of attainable apple snails, which are the Snail Kite's primary food source. AR 3322 at 61 ("[e]xtended hydroperiods and deep water impact woody vegetation...[t]his change represents a reduction in the quality of foraging habitat for snail kites, and a reduction in the suitability of habitat to support abundant apple snails").

This restriction of water allegedly continued after the FWS issued a Biological Opinion in 1999 ("1999 BO"), and an Amended Biological Opinion in 2002 ("Amended BO"). The Plaintiff contends that the Amended BO concluded, without proper evidence or analysis, that portions of the designated Snail Kite critical habitat would not be affected by the Reasonable and Prudent Alternatives ("RPA"), which were adopted within the Amended BO. During the course of this action, a Second Amended Biological Opinion (2006 BO) (dkt # 70-1) was filed.

The biological opinions, promulgated by FWS, exist to provide analysis regarding the Army Corps of Engineers ("Corps") Interim Operational Plan ("IOP"). The Corps' IOP exists to set forth a procedure for preforming its duties while balancing those duties affect on the environment. The Corps has operated under the particular IOP since 2002. *See* Def. Mot. at 1.

---

[4]     Water Conservation Area 3-A ("WCA-3A") is an Everglades marsh comprising in excess of 100,000 acres in Miami-Dade and Broward counties.

The IOP provides for operation of the Central and Southern Florida Project in a way that protects the Sparrows nesting habitat, but also mitigates flooding, allowing for the development of land and other projects. Id.

On November 17, 2006, FWS promulgated its 2006 BO, which is now the operative biological opinion, superseding the 2002 and 1999 Opinions. *See* Amd. Compl. at 11. In response, Plaintiff filed a Second Amended Complaint (dkt # 76). Generally, in the Second Amended Complaint (dkt # 76), Plaintiff seeks (1) injunctive and declaratory relief for a "faulty" Amended biological opinion in violation of the Endangered Species Act ("ESA") and its implementing regulations, pursuant to the Administrative Procedure Act ("APA") (Count I); (2) injunctive and declaratory relief for violations of Section 7 of the ESA and its implementing regulations (Count II); (3) injunctive and declaratory relief for violations of Section 9 of the ESA and its implementing regulations (Count III);  for improper agency action under the APA (Count IV). See Second Amended Complaint.  This Court previously dismissed Count III, but held that Plaintiff may pursue Count III under Count I, which requests relief under the APA . *See* Order Granting Motion for Partial Judgment on Pleadings (dkt # 107).  In sum, Plaintiff requests summary judgment by challenging the FWS' 2006 BO for failure to adhere to the requirements of ESA and for improper agency action under the APA.

In response, Federal Defendants seek summary judgment on all Plaintiff's claims.  Federal Defendants maintain that the FWS did not act arbitrarily, capriciously, or commit a clear error of judgment; consequently, FWS' determinations should be granted great deference and  be upheld. *See* Def. Mot. at 4.

## II.    ANALYSIS

### A.  Standard of Review

The standard of review, employed by this Court, for the remaining claims in this case is provided by the APA and the ESA. *See* Fund for Animals, Inc. v. Rice, 85 F.3d, 535, 547-548 (11th Cir. 1996); *See also* Sierra Club v. Flowers, 423 F. Supp. 2d 1273, 1283-84 (S.D. Fla. 2006).  Under both the APA and the ESA, this Court is only permitted to overrule agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).  Specifically, the arbitrary and capricious standard of review also applies to claims brought under environmental statutes such as the ESA.  *See* Flowers, 423 F. Supp. at 1284.  In deciding whether agency action was arbitrary and capricious, the court determines "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Further, summary judgment is only appropriate where the administrative record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c). Fed. R.Civ.P.; *See also* Preserve Endangered Areas of Cobb's History, Inc., v. United States Army Corps of Engineers, 87 F.3d 1242, 1246 (11th Cir. 1996).  Only issues of *material* facts, which are defined as facts "that might affect the outcome of the suit under the governing law," will  preclude entry of summary judgment. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Despite the moving party's high burden, the Eleventh Circuit cautions, "[h]owever, even in the context of summary judgment, an agency action is entitled to great deference." Id.  The Supreme Court states that the strong deference the courts

6

give to agencies when reviewing APA and ESA claims is to "protect agencies from undue

judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract

policy disagreements which the courts lack both expertise and information to resolve." Norton v.

Southern Utah Wilderness Alliance, 542 U.S. 55, 56 (2004).  Further, the Supreme Court also

held that when the court reviews agency decisions that are technical and require scientific

determinations, "a reviewing court must generally be at its most deferential." Marsh v. Oregon

Natural Resources Council, 490 U.S. 360, 377 (1989).  This Circuit's jurisprudence prevents the

Court from electing to use its judgment in lieu of the agency's. *See* Preserved Endangered Areas

of Cobb's History, Inc., 87. F.3d at 1246. The reviewing court must still, however, engage in a

"thorough, probing, in-depth review." *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401

U.S. 402 (1971).

Therefore, the Court is cognizant of its difficult task in examining the record, ensuring no

issues of *material* fact remain, and maintaining great deference to agency action on scientific and

technical issues of fact.  As the Supreme Court so aptly stated in Marsh, "[t]he question presented

for review in this case is a classic example of a factual dispute the resolution of which implicates

substantial agency expertise." *See* Marsh 490 U.S. at 376.

### B. Challenging 2006 BO as Violative of ESA and APA (Count 1)

Plaintiff argues that FWS' 2006 BO does not comport with the requirements of the ESA.

*See* Pl. Mot. at 6.

The ESA mandates that FWS, when rendering its BO, rely on the "best scientific data

available." 16 U.S.C. § 1536(a)(2); Flowers, 423 F. Supp. 2nd at 1377; *See also* Pl. Mot. at 6.

Other circuits have held that the "best scientific and commercial data available" requirement

allows the rendering agency to rely on existing evidence rather than conducting new studies, but agencies are prohibited from ignoring existing data. *See* Heartwood, Inc. v. U.S. Forest Service, 380 F.3d 428, 436 (8th Cir. 2004). Apart from the general guidance that agencies must examine available data, the determination of "best scientific data" naturally permits the agency some discretionary latitude in selecting data. It is these discretionary judgment calls that the agency is permitted, encouraged, and insulated in making. *See* Preserved Endangered Areas of Cobb's History, Inc., 87. F.3d at 1246.

Here, Plaintiff claims that FWS did not use the best science available in rendering its 2006 BO, which analyzed the Corps IOP regarding protection of the Sparrow and impact on the Snail Kite. *See* Pl. Mot. at 7. Plaintiff argues that FWS failed to consider updated Snail Kite data from 2003 and the reports of certain field scientists. Id (stating that "there were warnings from the scientists studying the Snail Kite, as early as 2003, about "the immediate risk of extinction"). Federal Defendants respond that FWS did consult the 2003 Snail Kite Report in making its 2006 BO, but, after submitting the report for peer review and receiving comment, determined that the report was unreliable and analytically flawed. *See* AR 2987 (stating

> [t]hank you for submitting the Snail Kite Demography Annual Report 2003...As you are aware, the report presents a dramatic deviation from research previously presented by your team....Due to the controversial nature of the conclusions drawn in the report, we distributed it [for review]. All four reviewers recommended using caution in interpreting the report based on the brevity of the methodology described).

Plaintiff also alleges that FWS ignored the findings of certain field scientists, but FWS is free to exercise their discretion in choosing which opinions they opt to place reliance on. *See* Marsh, 490 U.S. at 378.

Next, Plaintiff utilizes a great deal of space to discuss how the 2006 BO and IOP will harm the Snail Kite and its critical habitat. *See* Pl. Mot. at 8-10. 16 U.S.C. § 15365(b)(4), permits the incidental taking of a listed species, such as the Snail Kite, and removes any liability for this potential take. Again, agencies are entrusted with great discretion and deference in utilizing their expertise to make determinations on the best way of protecting all endangered species. In this case, FWS made the determination that restricting the water flow, while negatively affecting the Snail Kite, was important in maintaining nesting grounds for the Sparrow. *See* AR 3322 at 65-66 ("[w]hile this hydroperiod is longer than what is considered optimal for sparrows, it does support some sparrow habitat"). It appears that the parties agree that the IOP will not necessarily permit the Sparrow to flourish, but as Defendants maintain, it should preserve the number of Sparrows until a long term solution is enacted. The record also indicates that the Sparrow is in greater danger of extinction and is less viable than the hardier Snail Kite. *See* AR 3322 at 73 ("because snail kites are long lived, have high rates of adult survival, continue to successfully nest in other portions of their range in southern Florida, these impacts are not anticipated to appreciably reduce the likelihood of survival and recovery of the species in the wild").

Plaintiff next alleges five specific faults with FWS' 2006 BO. Again, given the discretion awarded to agencies and the requirement that they provide a well informed and non-erroneous determination, this Court finds that the FWS 2006 BO does not fail based upon Plaintiff's allegations. Each shortcoming is taken in turn.

First, Plaintiff argues that FWS' 2006 BO does not analyze the IOP's impact on all parts of the action area. Specifically, Plaintiff states that the 2006 BO does not analyze all protected

species or the full impact of the IOP on the Snail Kite's range within South Florida. *See* Pl. Mot. at 10. Defendant adequately responds by stating that the 2006 BO addressed both the issues of all protected species and the IOP impact on the Snail Kites range. FWS accomplished this task by concurring with the Corps' earlier biological assessment and examining the relevant Snail Kite range respectively. *See* AR 3322 at 1-2; *see also* AR 3322 at 13 ("[t]he Service has determined that the action area for this project includes the entire range of the Everglades snail kite and the Cape Sable seaside sparrow"); *See also* AR 3322 at 21 (Figure 2: Map of Snail Kite and Sparrow Action Area).

Second, Plaintiff reasons that the 2006 BO does not contain a sufficient analysis of the environmental baseline. *See* Pl. Mot. at 10. Again, Defendants adequately respond to Plaintiff's claim by listing a multitude of instances within the record that relate to calculation of the environmental baseline. *See* AR 3322 at 56-64 ("fires render sparrow habitat unsuitable for occupancy by sparrows because they remove the vegetation that sparrows rely on...[c]hanges in vegetation composition can result from changes in hydrologic conditions...[c]onstruction and maintenance of roads, canals, and levees near sparrow habitat may result in direct and indirect impact to sparrows"). Further, Defendants do evaluate the direct and indirect effects of their actions by discussing the condition of the Snail Kite population throughout its range and considering the overall impact on Snail Kite habitat. *See* AR 3322 at 42-44. Plaintiffs also argue that FWS failed to adequately analyze the cumulative effects of activities that are reasonably certain to occur within the action area. *See* Pl. Mot. at 12. The FWS does not go into great detail, but does state that it has considered and formally consulted with other groups regarding their impact on the Snail Kite. *See* AR 3322 at 61. Further, FWS does go on to discuss and

10

*analyze* specific actions that might affect Snail Kite habitat. *See* AR 3322 at 62 ("[c]onstruction projects have caused degradation in kite habitat in some portions of the kite's range. Within the Kissimmee Chain of Lakes, residential development on lakeshores has resulted in altered litoral zone vegetation. Construction of docks and maintenance of waterways that service residential development has altered kite foraging habitat."). Further, the ACCELER8 project, which is a South Florida Water Management District program that seeks to speed up Everglades restoration by funding eight specific water management projects and putting their completion on an expedited schedule, might affect Snail Kite habitat. Two of the eight ACCELER8 projects appear to be located in Snail Kite habitat on the outskirts of WCA 3-A. FWS does not explicitly analyze the state funded ACCELER8 projects in its environmental baseline because FWS did not anticipate that it would adversely affect the Snail Kite; this Court cannot substitute its judgment for that of the FWS or impose on FWS the benefit of hindsight regarding what might or might not affect Snail Kite habitat.[5] The FWS did consider the environmental effects of its actions, as well as those of other projects. The fact that those conditions do not meet Plaintiff's standards, does not render them insufficient.

---

[5]    This Court granted Plaintiff's Motion to Strike; consequently, this Court will not take judicial notice of Defendants' citation to public documents relating to consultation on the ACCELER8 project that lay beyond the scope of the administrative record. This Court will, however, permit Defendants to state their reasoning, ("projects were not anticipated to result in adverse impacts to kites or their critical habitat"), for why the projects were not specifically discussed in the 2006 BO.

11

Third, it is Plaintiff's contention that FWS' 2006 BO conclusions regarding jeopardy of the Snail Kite and its habitat are contrary to the facts. *See* Pl. Mot. at 12. Plaintiff asserts that FWS's 2006 BO fails to acknowledge the possible 40% Snail Kite habitat degradation, current Snail Kite population decline, and long term dangers to the Snail Kite. Id. FWS, again, successfully thwarts this criticism by citing references that the Snail Kite population will not be adversely affected over the next four years. FWS states that Snail Kites will not be adversely affected because the "kites regularly and successfully breed in other parts of their range, kites are long lived, and kites have high adult survival rates under normal (non-drought) conditions." *See* AR 169 at 10-13; AR 31 at 445. Further, FWS argues that the 2006 BO and its analysis of the IOP, does not necessarily mean that all of the Snail Kite habitat will be affected, that it will be affected annually, and that it is not capable of hydrologic restoration. *See* AR 3322 at 70. The Snail Kite, unlike the Sparrow, is distributed over greater expanse of acreage and can correspondingly react better to hydrologic change. Id at 34 ( stating that Snail Kite has over 841,635 acres of critical habitat, though some 40% may be in a degraded condition). Therefore, FWS reasoning and judgment, with which this court cannot substitute its own, is reasonable and is not contrary to the facts.

Fourth, Plaintiff second guesses FWS' analysis, in the 2006 BO, of how the IOP and RPA will impact recovery of the Snail Kite. *See* Pl. Mot. at 12-13. As the paragraphs above indicate, the FWS made decisions about which data and findings they deemed the most accurate and credible, and then made their conclusions accordingly. In this instance, FWS had to balance possible Snail Kite habitat degradation, the effects of which are not conclusive, against immediate protection of the Sparrow. *See* AR 3322 at 32, 38-40, 65, 70, 77. FWS's

12

determination that four more years of reversible hydrologic change will not substantially jeopardize the Snail Kite or its recovery, is a technical determination FWS is permitted to make and is likewise entitled to deference. *See* AR 3322 at 70, 73 ("[t]hese impacts are expected to limit population growth in WCA-3A and possibly cause further reductions in the overall kite population...[h]owever...these impacts are not anticipated to appreciably reduce the likelihood of survival and recovery").

Plaintiff's final grievance regarding FWS' promulgation of the 2006 BO is that the 2006 BO's Incidental Take Statement ("ITS") is defective. *See* Pl. Mot. at 14. Plaintiff calls particular attention to the ITS' lack of a specific number of endangered species that can be taken; the endangered species include the Sparrow, Snail Kite, and Wood Stork. Id. Plaintiff cites non-binding authority of the Ninth Circuit as the justification that the FWS must articulate its ITS figures in definite numerical terms. Id. The FWS, in its ITS, provides habitat benchmarks, which are used to determine when the incidental take has been exceeded and reinitiation of consultation regarding the take is necessary. *See* AR 3322 at 77 (stating "the Service anticipates that incidental take of snail kites in the form of harm resulting from reduced ability to forage successfully...will occur whenever water levels rise above 10.5 ft NGVD (National Geodetic Vertical Datum) as measured at gauge 3A-28").[6] The regulations pertaining to the ITS do not require a numeric estimate. *See* 50 C.F.R. § 402.14(i). FWS maintains that in this particular

---

[6]     The height of water measured in NGVD, at least in the Everglades, does not mean that the water level is 10.5 feet above the ground, but rather takes into account the water beneath the ground as well.

instance, obtaining a figure on the number of birds is impracticable because WCA-3A is approximately 786 square miles. *See* AR 3322 at 77; *See also* Def. Mot. at 14. FWS' habitat benchmarks for the Snail Kite are in terms of water recession. Id. FWS states that water recession is a manageable method for the Corps to monitor impact on the Snail Kite. *See* AR 3322 at 77. Similarly, FWS established the incidental take of the Sparrow based upon amount of water release. *See* AR 3322 at 76 ("if more than 66 square-miles of habitat are unavailable for nesting sufficient to maintain the subpopulation (fewer than 60 consecutive days with water levels below ground surface at NP-205) due to water releases in any one year, then incidental take will be exceeded"). Water release appears to be a logical incidental take benchmark for the Sparrow because it is flooding that destroys Sparrow nests. Id. The 2006 BO also states that the Corps is to conduct interagency communication to coordinate and analyze their operations so that the impact on listed species, such as the Snail Kite and Sparrow, is minimized. Id at 79 ("Corps will continue to conduct interagency operational conference calls to coordinate and discuss operations that will minimize impacts on listed species"). Finally, the 2006 BO, in compliance with 50 C.F.R. § 402.16(a-d), also provides that reinitiation of consultation will occur if the circumstances change or the habitat benchmarks setting the incidental take are exceeded. *See* AR 3322 at 81.[7]

---

[7]     Plaintiff subsequently devotes another section of their motion to challenging the ITS regarding the Snail Kite. *See* Pl. Mot. at 23. Plaintiff again argues that the absence of high-water criterion within the ITS makes it arbitrary and capricious. As already discussed, FWS' choice to use recession rates is permissible. The use of recession rates as a trigger, coupled with the FWS'

Therefore, as to Plaintiff's count one, which argued that FWS' 2006 BO is contrary to the ESA and was "rushed," this Court finds that FWS' 2006 BO was in compliance with the ESA. This Court must grant deference to FWS' determinations and discretionary decisions. *See* Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004). As articulated above, FWS utilized the data available, made determinations about which data to rely upon, and successfully countered each of Plaintiff's specific allegations of non-compliance. The data and studies relied upon by the FWS do not have be flawless, and FWS' decision to rely on particular data is subject to deference. *See* American Iron and Steel Institute v. E.P.A, 115 F.3d 979, 1005 (C.A.D.C. 1997). Thus, as to Count I, FWS did not act arbitrarily and capriciously in rendering the 2006 BO because the decision was based on a consideration of the relevant factors and there was not a "clear error of judgment." Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Plaintiffs may disagree with FWS' conclusions, but that does not render their findings arbitrary and capricious.

---

determination that Snail Kite habitat can be restored, the IOP's limited operation time of four additional years, and the Snail Kites' ability to adapt to the new conditions and temporarily move to more suitable habitat, means that the incidental take is not unrestricted nor left unmonitored. *See* AR 3322 at 70, 38. The ITS is specific enough and accounts for enough monitoring to avoid a blanket take authorization that was struck down in Oregon Natural Res. Council v. Allen, 476 F.3d 1031, 1039 (9th Cir. 2007).

## C. Challenging 2006 BO as Violative of Section 7 Consultation Process (Count II)

Plaintiff's next argument is that FWS' ESA section 7 consultation was inadequate. *See* Pl.

Mot. at 17.[8]   Endangered Species Act § 7(a)(1)-(2) (16 U.S.C. § 1536(a)(1)-(2)) requires:

> (1) [t]he Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

> (2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

Furthermore, reinitiation of consultation is required when new information or a greater adverse

impact upon critical habitat or species is revealed. 50 C.F.R. § 402.16.

In its Count II claim, Plaintiff essentially repeats the same argument that  FWS failed to

use the best scientific and commercial data available, create a proper environmental baseline, and

criticism regarding the Sparrows alleged failure to flourish. *See* Pl Mot. 6-12, 17-21. This Court

has already addressed and disposed of Plaintiff's arguments regarding the scientific data.

environmental baseline, and failed expectations regarding Sparrow recovery; thus, the only

---

[8]    In this section of their motion, Plaintiffs rehash many of the same arguments

addressed above and their repetitive points are unpersuasive.

remaining issue regarding Count II is the occurrence of the consultation itself.

In the current dispute, Plaintiff complains that the statutorily required consultation, which took place, did not occur within Plaintiff's preferred time line. *See* Pl. Mot. at 18. The FWS engaged in consultation in July 2006. *See* AR 3181 at 1-2. Plaintiff does not dispute that consultation took place, but rather that FWS waited too long in conducting the consultation. *See* Pl. Mot. at 18. FWS engaged in the requisite consultation and rendered its 2006 BO in accordance with the deadlines set forth by this Court. *See* Order (dkt # 68) ("that FWS shall complete its revised Biological Opinion on or before November 20, 2006"). FWS' determination as to when to initiate consultation remains up to its discretion. As discussed above, FWS' determinations and assessment of data are upheld because they are not arbitrary, capricious, or a clear error in judgment, but rather represent an attempt to strike a balance among competing interests and to preserve all species under challenging circumstances. *See* Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

In addition, Defendants correctly note that the responsibility of reinitiating consultation under Section 7(a)(1), 16 U.S.C. § 1536(a)(1), applies to the action agency, not FWS, who is the consulting agency. *See* Def. Resp. at 17; *See also* Salmon Spawning & Recovery Alliance v., 477 F. Supp. 2d 1301, 1304 (CIT 2007) (stating "[t]he Secretary of the Interior administers ESA through FWS."); *See also* Treatise on Environmental Law, § 12.04[7][h] ("Section 7(a)(2) requires each federal agency to consult with the Secretary of the Interior (*usually the Fish and Wildlife Service*) to ensure that agency actions are not likely to jeopardize the continued existence of any endangered species or result.") Id (emphasis added). Since FWS administers ESA, it would be illogical to read ESA § 7(a)(1) to require FWS to consult with the Secretary regarding a

17

program that it already administers and serves as chief consultant.[9]

Regardless of Plaintiff's contention that additional FWS consultation is required under §
7(a)(1), FWS has satisfied this alleged additional duty by rendering an opinion aimed at
conservation. This Court has previously held that "in fulfilling the requirements of ESA §
7(a)(1), as long as an agency has implemented a program aimed at conservation, the 'court is not
the proper place to adjudge and declare that defendants have violated the ESA as a matter of law
by not implementing the process listed by [plaintiff].'" Florida Key Deer v. Brown, 364 F. Supp.
2d 1345, 1360 (S.D. Fla. 2005) (internal citations omitted). Here, Defendants have issued an

---

[9]    It is unclear whether Plaintiffs are suggesting that FWS had some responsibility to
reinitiate consultation, but the Court pauses to clarify who bears the responsibility of reinitiation.
 This Court, in its May 12, 2006 Order, stated that it was conceivable and that FWS may be held
responsible for reinitiating consultation. Miccosukee Tribe of Indians v. U.S. Army Corps of
Engineers, et al., 430 F. Supp. 2d. 1328, 1334. Here, at this summary judgment stage, this Court
finds that it was the Corps duty to reinitiate consultation, though FWS might be obligated to send
a letter explaining the need for reinitiation. In this case, the point is somewhat moot and no
longer before this Court because reinitiation did occur. Further, this Court earlier found, in the
companion case Miccosukee Tribe of Indians v. U.S. Army Corps of Engineers, et al, 420 F.
Supp. 2d 1324, 1337 (S.D. Fla. 2006)), that the Corps was not required to reinitiate consultation,
which also effectively eliminates the initiation of consultation issue.

18

opinion aimed at conservation; thus, satisfying any alleged additional § 7(a)(1) requirements.[10]

Plaintiff's final Count II contention asserts that FWS, pursuant to DOI Secretarial Order # 3206, should have consulted directly with the tribe regarding the 2006 BO and its potential impact on tribal interests. *See* Pl. Mot. at 21. As this Court has already held, "DOI Secretarial Order #3206 is 'for guidance within the Department only,' and does not create any substantive trust obligation" or create a cause of action. *See* Order (dkt # 38) at 11.

Therefore, as to Count II, FWS did meet ESA § 7(a)'s consultation requirement by engaging in consultation, making informed decisions based upon what it deemed was the most reliable data, and developing an opinion that seeks to preserve an endangered species.

Plaintiff ends its Motion to Dismiss with Count IV, which claims that FWS' 2006 BO is

---

[10]    Plaintiff argues two additional specific points in opposition to FWS' 2006 BO. First, Plaintiff incorrectly claims that FWS failed to explain why an incidental take of Sparrows was now authorized. FWS adequately addressed that issue in the 2006 BO explaining that the take was based upon new information. *See* AR 3322 at 76. This Court will not hold a new, better informed, assessment against the FWS. Second, Plaintiff criticizes FWS for its failed hypothesis that closing the S-12 gates would cause Sparrow Subpopulation A to flourish. *See* Pl. Mot. at 20. FWS maintains that closure of the S-12 gates will maintain Subpopulation A in the short term, which is all that is required. *See* AR 3322 at 73; <u>Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation</u>, 143 F. 3d 515, 523 (9th Cir. 1998) (stating the determining authority, whether it be the Secretary or the FWS, is "not even required to pick the best alternative or the one that would most effectively protect the [species in question.") <u>Id</u> (internal citations omitted).

contrary to the ESA under the APA. Id. In Count IV, Plaintiff simply restates all of the previous

claims analyzed and overruled above. Specifically, this Court, for the reasons stated above, finds

that FWS did examine relevant information, articulated a satisfactory explanation for its action,

including a rational connection between the facts found and choice made, engaged in adequate

Section 7 consultation, and issued a proper ITS. *See* Sierra Club v. Flowers, 423 F. Supp. 2d

1273, 1376 (S.D. Fla. 2006). Count IV, thus, provides equally uncompelling evidence that FWS'

2006 BO was arbitrary and capricious.

### III. CONCLUSION

As articulated above, no factual issues remain, but rather questions of law that deal with

legal determinations of whether FWS followed and engaged in the correct protocol regarding the

2006 BO. This Court recognizes that discretionary decisions were made that do not necessarily

comport with Plaintiff's requests. These discretionary determinations, however, are reviewed

deferentially because great deference is to be given to agency determinations. Therefore, the

court finds, pursuant to FRCP 56 that no issues of *material* fact remain and Defendants are

entitled to judgment as a matter of law based upon the deferential standard given to agency

determinations. As the Supreme Court stated, "in making the factual inquiry concerning whether

an agency decision was 'arbitrary or capricious,' the reviewing court must consider whether the

decision was based on a consideration of the relevant factors and whether there has been a clear

error of judgment." *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971)

(remanded on other grounds). Here, the Court is satisfied that FWS, the agency in question,

rendered its 2006 BO based upon the relevant factors and exercised its statutorily and

jurisprudentially protected discretion and made a correct judgment as to the immediate preservation of the Sparrow.   For the foregoing reasons, it is

ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment on Counts I, II, and IV of Plaintiff's Second Amended Complaint (dkt # 134) is DENIED.  It is further

ORDERED AND ADJUDGED that Federal Defendants' Motion for Summary Judgment on all of Plaintiff's Claims (dkt # 131) is GRANTED.  The Clerk of the Court is directed to CLOSE this case and all other pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 21st day of December, 2007.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:     All counsel of record

21